In re Estate of Dr. George T. Jacoby, deceased. Appeal of Safe Deposit and Trust Company, Trustee.

*Wills—Probate—Signing at end of will—Detached papers.*

Testator executed a formal will and shortly afterwards a formal codicil and deposited both will and codicil in a trust company where they remained unchanged until his death. After testator's death two tin boxes were found in the vaults of a bank, on the outside of one of which was pasted a small paper containing the following words: "In case of my death I want this box given to my attorney, S." The paper was signed at the end with testator's name. Within the box were various envelopes containing securities and other papers, and on the back of some of the envelopes was the testator's name. On the backs of other envelopes were names of persons and institutions preceded in some cases by the words "This is to go to—." None of these directions on the envelopes were signed by the testator. S., the person who was named in the paper pasted on the outside of the box, was testator's attorney, who had prepared the formal will and codicil which testator had executed, and he was one of the executors nominated in the will. The will and codicil were entirely inconsistent with the directions indorsed on the envelopes. There was no proof that the direction on the back of the box had been signed ·by the testator after the date of the will and codicil. Some of the papers contained in the box bore dates later than the will and the codicil. The other box containing only old daguerreotypes, silverware and jewelry had on it a paper on which were written directions to whom it was to be given. *Held,* that the writing on the back of the box and the indorsements on the envelopes were not testamentary in character, and that the only papers entitled to probate were the will and the codicil.

Argued Feb. 24, 1898. Reargued Nov. 2, 1898. Appeal, No. 22, Oct. T., 1898, from decree of O. C. Allegheny Co., March T., 1897, No. 157, on appeal from register of wills. Before STERRETT, C. J., GREEN, MITCHELL, DEAN and FELL, JJ., on argument. Before GREEN, WILLIAMS, MCCOLLUM, MITCHELL, DEAN and FELL, JJ., on reargument. Reversed.

Appeals from register of wills. Before HAWKINS, P. J.
The facts appear by the opinion of the Supreme Court.

*Error assigned* was the decree of the court.

*J. McF. Carpenter,* for appellant.—It is too plain for argument that the unsigned memoranda on the backs of the envelopes

in the box are not testamentary, and do not constitute a will, either in form or substance. This would be true in the absence of the act of 1833: Plumstead's App., 4 S. & R. 545; Barnet's App., 3 Rawle, 20; Grant v. Levan, 4 Pa. 424; Campbell's Est., 7 Pa. 100; Crawford's App., 61 Pa. 54.

Careful search has failed to discover a case precisely like the present, but in principle, the case of Patterson v. English, 71 Pa. 454, supports our contention.

An examination of the facts in Porter v. Turner, 3 S. & R. 108, Ginder v. Farnum, 10 Pa. 98, Wikoff's App., 15 Pa. 281, and Fosselman v. Elder, 98 Pa. 159, will leave no room for doubt on two points: (1) that those cases were correctly decided, and (2) that they differ so radically from the present case as to be absolutely valueless as authority for the proposition contended for by appellees.

That mere parol declarations by the testator as to his wishes concerning the disposition of his property, whether made contemporaneously with the execution of the will or at another time, in the absence of fraud, cannot be admitted in evidence under the statutes of wills so as to affect the written will: Schultz's App., 80 Pa. 402; Fox v. Fox, 88 Pa. 19; Porter's App., 94 Pa. 332; Bowlby v. Thunder, 105 Pa. 173.

*Q. A. Gordon* and *S. S. Mehard*, with them *C. H. McKee*, for appellee, Mary Powers.—The writings in question constitute a will: Williams on Executors, 141; Scott's Est., 147 Pa. 89; Sunday's Est., 167 Pa. 37.

The formal will, in connection with which the writings in question have been probated, does not prevent the operation of the latter as a testamentary disposition: Cook v. Lambert, L. J. N. S. 32 Prob. 93; In Goods of Gausden, L. J. N. S. 31 Prob. 53; Williams on Executors (6th ed.), 140; Greenfield's Est., 14 Pa. 489; Denny v. Barton, 2 Phillimore, 575; Gladstone v. Tempest, 2 Curtiss, 650; Jenner v. Ffinch, L. R. 5 Prob. Div. 106.

The writings in question should be admitted to probate, because they were published by Dr. Jacoby as testamentary after the date of the formal will, and he adhered to them as such down to the time of his death: Havard v. Davis, 2 Binn. 406; Jones v. Hartley, 2 Wh. 103; Campbell v. Jamison, 8 Pa. 498;

Wallace v. Blair, 1 Gratt. 75; Jack v. Shoenberger, 22 Pa. 416; Gable v. Daub, 40 Pa. 227; In Goods of Thomas Dewell, 17 Jur. 1130.

*W. C. Bates*, for Ethel Jacoby, appellee.

OPINION BY MR. JUSTICE GREEN, March 20, 1899:

This case is of a highly exceptional character. In all ordinary cases of this kind the contest arises upon the question whether an informal or irregular paper or collection of papers constitute the last will and testament of a deceased person. It is then a question of testament by the papers presented as such, or of no testament at all, and the contest is necessarily conducted upon the manifest theory that the deceased at least tried to make a will, and deserved assistance from the court or jury if it was reasonably practicable to give it to him. But in this case there is no such condition of things. This decedent had made and executed a formal, carefully prepared and undoubted last will and testament. It was written and rewritten several times, after numerous interviews and consultations with his attorney, Mr. Stevenson. To him the testator explained with the utmost minuteness and detail just what he wanted to go into the will. Mr. Stevenson testified: "I think I wrote it three or four times before I got it the way he wanted it. Q. Did he take away the documents as you prepared them and study them over and mark them? A. Yes, sir; he took them away and he had it marked, and he would say, that will not do; put that in, and I would put that in, and he would take it away, and he would bring it back again and have something else marked, and say that will not do and put it in, until finally he got the will such as it is." The witness had previously explained that Dr. Jacoby wrote the will himself in the first instance, but that he was not a good scholar, and could not spell very well, and he brought it to the witness for final preparation. But at last it was completed to the satisfaction of the testator, and then he executed it formally in the presence of two subscribing witnesses. This occurred on January 22, 1894. But on February 3, 1894, only twelve days later, he executed a codicil also formally prepared, and signed in the presence of two witnesses, in which he made a change in an important provision

of the will. After Jacoby's death this will and codicil were
duly proved and letters testamentary issued thereon to the ex-
ecutors named therein. As to that will, it remains undisputed
and unchallenged to this day. The final decree of the orphans'
court sustains it and it is not now a subject of contention.
Thus we have absolute knowledge and a judicial decree as to
what the real, actual will of the testator was, up to and on
February 3, 1894. All his wishes were plainly written down,
a number of legacies were given to different persons, and the
residue of the estate which was by far the greater part of it,
was directed to be invested in interest bearing securities, and
thereupon one half of the income, altered by the codicil to one
fourth, arising from the invested funds, was to be paid to the
children of Mary Downs, the petitioner in this case, one eighth
to Ethel Jacoby, and the remainder, to be known as the G. T.
Jacoby Protestant Orphans' Relief Fund, to the various pro-
testant orphan asylums and institutions within the county of
Allegheny. This charity would take nearly three fourths of
his entire residuary estate. The estate was large, amounting,
according to the inventory, to over $235,000 of personal estate,
and several parcels of real estate also.

Immediately after the death of the testator two tin boxes
which were in the vault of the Metropolitan National Bank
were delivered to the executors, and were opened by them and
an inventory of the contents was made. The larger box con-
tained bonds, certificates of various stocks, receipts and some
other papers constituting practically the whole of the decedent's
personal estate. The smaller box contained some silverware
and daguerreotypes of small value. On the outside of the larger
box there was pasted a small paper containing the following
words, "In case of my death, I want this box given to my attor-
ney, A. K. Stevenson, 439 Grant St.  G. T. Jacoby." Within
this box there was a variety of papers. Sixteen of them were
envelopes containing numerous individual papers of different
characters but chiefly certificates of mining stocks. There were
also receipts given by Geo. B. Hill & Company for certain
traction stocks and Air Brake stocks standing in their name on
the books, but being the property of Dr. G. T. Jacoby. There
were also other receipts and a mortgage for $10,000 and some
promissory notes. In addition to the foregoing, there were

deeds, agreements, an old mortgage and a Lawrence Bank pass book. Some of the envelopes had upon their outside certain written words, and others had no words of any kind written upon them. The envelope which contained by far the largest number of shares, receipts and the mortgage for $10,000 and was marked No. 1, had written upon its outside face the words "Dr. G. T. Jacoby," and no other words whatever. In this were certificates for five shares stock Emmens Zinc Company; 5,000 shares stock Mayflower Gold Company; 6,410 shares stock East Mayflower Gold Company; ten shares stock Gold Trust and Development Company; 2,932 shares stock Eclipse Gold Mining Company; 1,000 shares stock the Chicago Gold Mining Syndicate; mortgage Stephen H. Emmens $10,000; receipt for loan of $500 to East Mayflower Gold Company; receipt signed by Geo. B. Hill & Company certifying that 378 shares Citizens' Traction stock, seventy shares of Citizens' Pass. Ry. Company, twenty shares Ewalt St. Bridge Company stock, 770 shares Westinghouse Air Brake stock, all standing on the books of said company in the name of Geo. B. Hill & Company are the property of Dr. G. T. Jacoby. Receipt signed by Geo. B. Hill, certifying that 833 shares Westinghouse Air Brake Company, Limited, of London, England, standing on the books of said company in the same firm name, and 7,150 shares La Noria Mining Company, standing in the same name, are the property of George T. Jacoby.

The envelope marked "No. 2" had in it a quantity of old tax receipts from 1866 to 1887, and the words written on the outside were "Tax receipts from 1866 to 1887" and "Geo. T. Jacoby, 439 Butler St., Pittsburg, Pa."

The envelope marked "No. 3" had on it the printed words, "Baxter, Thompson & Co., 161 Fourth avenue, corner Grant street, Pittsburg, Pa." and written in ink the words "This goes to Miss Mary Gress, 228, 42nd street, Pittsburg Pa.," and also in the corner the written words, "Twenty Tarentum Bonds." Inside the envelope were twenty bonds of the borough of Tarentum, each in the sum of $500, payable to bearer, with interest at five per cent.

The envelope marked "No. 4" had on it the written words, "Roselia Maternity Hospital Pittsburgh," and on the inside were certificates amounting to 854 shares of Mayflower Gold Mining

Company of the par value of $10.00 each, and in the name of G. T. Jacoby, and the transfer on the back signed " G. T. Jacoby " and duly witnessed.

The envelope " No. 5 " had on it the written words, " Home for the Friendless Allegheny City," and on the inside were certificates for 634 shares of the Mayflower Gold Mining Company in the name of G. T. Jacoby, with the blank transfer signed by Geo. T. Jacoby and duly witnessed.

The envelope " No. 6 " had on the outside the written words " This is to go to Geo. B. Hill & Co. 1,400 shares. To Frederick Sermin 150 shares. To Geo. H. Henderson 150 shares," and in lead pencil the words, " 1,700 Emmens Metal shares." On the inside were certificates for 1,700 shares of the Emmens Metal Company of the par value of $10.00 each, all issued to G. T. Jacoby.

The envelope " No. 7 " had on the outside the business card of Geo. B. Hill & Company printed on the corner, and the written words, " This is to go to Mrs. Mary Downs and her family, Greenville, Mercer County, Pa." On the inside there were certificates, No. A 370 of the Citizens' Traction Company for ninety shares, of the par value of $50.00 each, issued to Geo. B. Hill & Company with the blank transfer on the back executed by Geo. B. Hill & Company; also certificate No. 541 for fifty-eight shares of the Citizens' Traction Company, of the par value of $50.00 each, issued to Geo. B. Hill & Company, with the transfer duly executed by Geo. B. Hill & Company; also certificate No. 645 of the Citizens' Traction Company for 100 shares of the par value of $50.00 each, issued to Geo. B. Hill & Company with transfer duly signed by that firm; also certificate No. 646 for 100 shares of the same stock and same par value issued to Geo. B. Hill & Company, with transfer duly executed; also certificate No. A 1,310 for thirty shares of the same stock, same par value, issued to Geo. B. Hill & Company, and transfer duly executed; also certificate No. 197 for twenty shares of the capital stock of the Ewalt Street Bridge Company, of the par value of $50.00 each, issued to Geo. B. Hill & Company, and transfer duly signed; also trustee scrip certificate for seventy shares in certain real estate remaining in the hands of Charles M. Gormley.

The envelope " No. 8 " had on the outside the written words,

"Frederick Seebick, Pittsburgh," and on the upper corner in lead pencil the word "Mayflower." On the inside were certificates for 626 shares of the Mayflower Gold Mining Company, par value $10.00 each, issued to Geo. T. Jacoby.

The envelope "No. 9" had on the outside the printed words, "The Metropolitan National Bank Pittsburgh, Pa." and the written words, "This goes to Mrs. Mary Downs, Greenville, Mercer County, Pa.," and below the words inclosed with a bracket "or her family." And in lead pencil were the words "770 W. A. B. American." On the inside were found certificates for 770 shares of the capital stock of the Westinghouse Air Brake Company, par value $50.00 each, issued to Geo. B. Hill & Company, with transfers duly executed by that firm.·

The envelope "No. 10" had on the outside the written words "A. K. Stevenson, Sr. or Jr. No. 439 Grant Street, Pittsburg." On the inside were certificates for 726 shares of the Mayflower Gold Mining Company, par value $1.00 each, issued to Geo. T. Jacoby, and transfers duly signed by him.

The envelope "No. 11" had on the outside the words, "This to go to the G. T. Jacoby Protestant Orphan Relief Fund, the net income arising therefrom," and in pencil the words, "833 W. A. B. C." On the inside were contained certificates for 883 shares of the Westinghouse Air Brake Company, Limited, of the par value of ten pounds each, issued to George Burton Hill, with transfer duly signed.

The envelope "No. 12" had on the outside the written words "Mrs. E. Murray's Will copy." And on the inside was a copy of the will of Mrs. Murray.

The envelope "No. 13" had in it some fire insurance policies.

The envelope "No. 14" had on the outside the written words, "Aughenbaugh notes." On the inside were found a package of notes, some stubs of check books, letters and copies of old papers of no value.

The envelope "No. 15" had on the outside the printed words "City Treasurer's Office, Pittsburgh, Pa.," and was addressed to Dr. G. T. Jacoby, having apparently gone through the mail. It had also the written words, "Standard Underground Cable." On the inside were found two certificates of fifty shares each of The Standard Underground Cable Company stock, par value $100 each, issued to Geo. B. Hill & Company and transfers duly

signed.   There was also found in this envelope the collateral note
of George B. Hill & Company for $5,000 for fifty shares of the
stock of that company, and it was testified that this note had been
paid and the collateral redeemed.   A receipted bill of Geo. B. Hill
& Company, dated April 6, 1896, was found in this envelope.

The envelope "No. 16" had written thereon the words "La
Noria" and in pencil, "7200 shares."   These certificates were
of the par value of $25.00 each, and were issued to Geo. B. Hill
& Company, with transfers duly signed by them.

There were also in this box a number of old deeds, mort-
gages, agreements, and a bank book of the Lawrence Bank of
Pittsburg, also some memorandum documents, but all seem-
ingly of no value.

The foregoing is a statement of the contents of the larger
box, marked "Exhibit No. 2."

The smaller box, marked "Exhibit No. 1," which contained
some silverware, daguerreotypes and a few articles of jewelry,
had pasted on its outside a small piece of paper on which were
the following written words, "This box belongs to Mrs. Mary
Downs—mustn't be opened, only by her.   Children, this is my
will, G. T. Jacoby."   On the inside of this box was found an-
other paper which contained the following words, "Mary I
want you to divide the contents of this box between your chil-
dren which is just living when it falls in your hands.   I hope
you will carry it out to the letter.   G. T. Jacoby."

On the hearing before the register, that officer made a de-
cree declaring that the two boxes with the writings appearing
thereon, the writing found in the smaller box, marked "Exhibit
No. 1," and all the contents of both boxes were testamentary
in their character, and together constituted the last will and
testament of George T. Jacoby.   He made this decree upon
the distinct ground that "the above recited testamentary writ-
ings were executed by the said George T. Jacoby, deceased, as
and for his last will and testament, at a date subsequent to the
date of the execution of the will and codicil heretofore pro-
bated; to wit, subsequent to the date of the 3d day of Febru-
ary, 1894, and on or about the 13th day of February."   By the
regularly executed will of the testator the Safe Deposit and
Trust Company of Pittsburg and A. K. Stevenson were appointed
executors.   By the decree of the register, A. K. Stevenson was

appointed sole executor. The decree of the register, without containing any formal revocation of the probate of the first will, did in point of fact set it entirely aside by force of the adjudication that the boxes, papers and contents of the boxes constituted and were the last will and testament of the decedent. The learned court below made a different decree which included the regularly written and executed will and codicil, and adjudged that they together with the boxes, papers and contents of the boxes constituted the last will and testament of the deceased. It is not distinctly ruled that the latter are to be regarded as a codicil to the will. On the contrary, as we understand the final decree, it includes both, and directs that they must be probated together. Thus, at the end of the opinion, the learned judge of the orphans' court says: "Both wills must therefore be probated, but as there can be only one probate they must be treated as forming parts of the will, and proven together." And in the concluding sentence of the decree it is said, "And it is further ordered, adjudged and decreed that the instrument of writing embraced in the probate decree of May 5, A. D. 1896, and the writings embraced in the probate decree of March 29, A. D. 1897, are together the last will and testament of George T. Jacoby deceased."

We have considered the contention involved in this cause with great care, with much patience and with the closest attention. We have heard two full arguments made by experienced and able counsel, and we have examined all the adjudicated cases which are supposed to sustain or justify the ruling of the court below, as well as those to the contrary effect. Having, as we do, a positive statute which declares, expressly, that "every will shall be in writing and unless the person making the same shall be prevented by the extremity of his last sickness shall be signed by him at the end thereof," and appreciating the enormous consequences which may flow from a disregard of this most wise and judicious enactment, we feel constrained to say that we cannot but regard the decision of the learned court below as a most grave and serious departure, not only from the letter and the substance of our statute, but also from the adjudications we have heretofore made upon this subject. Entertaining as we do the greatest respect for the learning and ability of the distinguished jurist who ruled this case in the

court below, we proceed to set forth our reasons for reaching a conclusion in hostility with that expressed in the final decree of the orphans' court.

In the first place we fail to discover any compliance with the requirement that the alleged testamentary writing shall be signed by the testator at the end thereof. It is claimed that the signature, "G. T. Jacoby," appended to the words written on the piece of paper pasted on the larger of the two boxes in evidence, is a compliance with the statutory requirement. If this writing contained words of a testamentary character there would be plausibility, and might be controlling force in this contention. But to us it is entirely clear that there are no words of that character in the writing. It must be remembered first that the box contained numerous papers and evidences of property interests belonging to the decedent. They have all been described in the enumeration hereinbefore set forth. They constituted practically the entire evidences of the ownership of the testator's personal estate. It must be also borne in mind that Mr. A. K. Stevenson was and had been for some years the confidential attorney of the deceased. He had written Mr. Jacoby's will after numerous consultations. He was appointed one of the executors of the will and would, therefore, be the proper custodian of the box and its contents after the testator's death. It was necessary that some person should be intrusted with such custody at once upon the death of the testator. Now the written words appearing on the box were these, "In case of my death I want this box given to my attorney A. K. Stevenson 439 Grant street, Pittsburgh, Pa. G. T. Jacoby." Upon the legal meaning of these words depends the entire ruling of the court below. If they constitute the execution of a testament they could be treated as a necessary part of a will. But if not of that character the whole fabric of the decision of the court below falls to the ground. There is nothing else upon which it can stand, or upon which it is claimed it can stand. There is no other signature of the deceased, anywhere, upon any paper or other substance, which has the least connection with the testamentary disposition of the contents of this box except the formal will of January 22, 1894, and its codicil of February 3, 1894, duly executed by the testator and properly attested. The absolute fate of the controversy depends upon

the meaning to be attached to the few written words we are now considering. What then is their meaning? Literally they are a direction that the box shall be delivered to A. K. Stevenson after the death of G. T. Jacoby. That is not only their literal meaning but it is their whole meaning. They are not in the least degree doubtful. They mean precisely what they say. There is no hidden meaning in them, and therefore there is no room for an implication of a meaning other than that which is expressed in plain and simple words. "In case of my death I want this box given to my attorney A. K. Stevenson." There is but the one idea that is possible to be extracted from the words, and that is the delivery of the box after his death to the person named. But the delivery of the box is a mere corporal act which relates only to its custody. Not a word containing any testamentary intent or purpose, express or implied, appears in the writing. There is not the least reference to the contents of the box or to any paper or thing therein contained. That it is to be delivered to Stevenson after the death of Jacoby imports nothing but a physical and necessary change of the custody of the box. Jacoby being dead, some one must have the custody which Jacoby held until the moment of his death. This, and this alone, is the full and absolute import of the words.

Can it be necessary to argue that these words do not and cannot make a will? Of course they do not. It is too plain for argument. Had there been any words which directed Stevenson to do anything with the contents, such as to deliver the envelopes which had names on them to the persons named, or to see that the contents were properly distributed, or words of a similar import, it might be that a testamentary intent might be attributed to them. But there is absolutely nothing of the kind. On the contrary, there is a most momentous, vital fact in absolute hostility with any inference of even a possible testamentary intent being contained in these words, and that is the fact that Jacoby had already executed a full, complete, carefully prepared and properly executed written will, in which his whole testamentary purpose was most fully and circumstantially declared. And not only that, but it was also the fact that that will was prepared by the very person to whom the custody of the box was committed, and not only that, but it was the further

fact that that person was appointed an executor of the will. How is it possible, in view of this consideration, to derive an inference that when such a person, in such circumstances, was merely appointed by the words in question to take the physical custody of the box, the whole testamentary scheme of the testator, as expressed in his written will, was to be absolutely destroyed, and another one set up without express words of any kind, without the least degree of implication from doubtful words, with not a solitary word indicating any intention to change, or alter, much less to strike down, any of his carefully expressed, fully written out testamentary dispositions previously made? And, especially, how can it possibly be inferred that there was an intent, by the use of words merely directing a necessary change of the custody of the box, to set up in the place of his formal written will a mere mess of absurdities, as will be shown later on, impossible of reconciliation either with the written will or with any real, conceivable, intelligent disposition of his estate? For it must again be borne in mind that the testator had carefully preserved his regularly executed, formal, written will up to the time of his death. He had caused it to be deposited in a secure place with the Safe Deposit and Trust Company of Pittsburg, and that company was named in the will as the other executor. And it must be presumed from all this that this will, thus carefully prepared and carefully preserved by the testator until the moment of his death, was in fact, and was intended to be, the final, determinate and conclusive expression of his full and complete testamentary intent and purpose. With no destruction, no cancelation, no change or alteration of any kind, no codicil other than the formal and carefully prepared and executed codicil of February 3, 1894, how can it possibly be said that this will was, or was intended to be, abandoned, changed, altered in any manner whatever? There is not a solitary fact or feature to be found in the case indicative of any such purpose. In this respect there is not a single case cited for the appellee that is applicable to the present question. All of them are destitute of any such fact as this. We therefore conclude that the words relied upon to sustain this alleged last will of George T. Jacoby are not words of a testamentary character, and hence they are totally inoperative to effect such a purpose.

But in the next place there is not a particle of proof that the signature, " G. T. Jacoby," appended to the words in question, were placed there at any time after the formal will was executed on January 22, 1894. There was but one witness examined on this subject. That person was George Seebick, who was the cashier of the Metropolitan Bank, at which place the two tin boxes were deposited. The relations between him and the testator seem to have been quite intimate, and they extended back for several years prior to the testator's death. He was familiar with the boxes, had often seen them, and had a number of conversations with the testator respecting them. He testified : " I know he had that direction on the outside of that box. Q. How did you know that? A. I saw that box many a time; I brought it out many a time." On cross-examination he was asked : " Q. When was the indorsement that you speak of there on the tin box, directing its delivery to Mr. Stevenson, made ? A. That was there several years. At first that box was wrapped up in another paper; it had another paper on it; he had the box with us six or seven years and along after a while that paper came off and I saw the instruction on the box, and he told me that if anything should happen to him that this box was to go to his attorney. Q. You mean that after the old paper that was around the box came off, then it was that you discovered this written instruction to deliver it to Mr. Stevenson ? A. Yes, sir, if I remember right; there was some sort of address similar on the other wrapper. Q. That was a good many years before his death? A. Yes, sir, a long while. Q. Have you any idea how many years ? A. I think he started his account with us in about 1889 or 1890, somewhere along there. Q. It was probably about that time, was it ? A. Yes, sir. He very often opened the box in my presence. Q. After that ? A. Yes, sir. Q. After he first left it there ? A. Yes, sir. Q. Of course as to the box in which he had the securities he took them out and put them in as he pleased ? A. Yes, sir." After saying he did not remember whether the writing was in ink or lead pencil, and that this box was kept on the inside of their safe, he was asked : " Q. Do you remember whether the writing which you refer to as having been on several years was in ink or lead pencil ? A. I could not tell you. Q. Do you know whether it was signed when you first saw it or not ? A. I

could not remember that? Q. Do you know whether it was
simply instructions without any signature to it, or whether it
was signed when you saw it? A. I could not remember that.
I know when he took this trip around the world, then this writ-
ing was brought to my attention specially, that is on there now.
. . . . Q. Did you ever notice until after the death of Dr. Ja-
coby whether or not the writing on this box was signed by
him? A. This big box you mean? Q. Yes, sir. Can you recol-
lect at any time that you noticed it whether or not the signature
was to it, or whether it was simply a label in his handwriting?
A. It was about the delivery of the box; more than that I don't
remember. Q. Have you any recollection whatever on the sub-
ject whether the writing on the box was signed by him or was
not signed? A. I can't say that the signature was on there.
Q. Do you remember when it was you noticed this signature on
the box, and if so state the time. A. I don't remember of
seeing the signature, I could not state positively whether there
was or there was not a signature on the box. . . . Q. You are
not able to state whether there was a signature to it or was not
a signature to it? A. I never paid any attention to that.
Q. You simply don't know? A. The directions were put into
my mind about this conversation about that box more especially.
I know he had written on this box, 'this goes to A. K. Stevenson.'
Q. That was away back years and years ago? A. A good while
ago, yes, sir."

There was no other testimony than the foregoing as to the
making of the signature. There is no proof whatever that in
point of fact the signature was made at any time after the ex-
ecution of the will. On this subject the learned judge of the
court below said in his opinion: "It will be seen that neither
indorsement on the box nor the envelopes has a date. The
proof shows that the direction on the top of the box had been
there long before the date of the will already admitted to pro-
bate, but it does not appear when the signature was attached.
The presumption arising from the use of pen and pencil is that
they were written at different times; and the signature being
at the end must be presumed to have been made last; but
whether before or after the date of the will already probated,
does not satisfactorily appear." There is therefore no finding
and no proof that in point of fact the signature was made after

the execution of the will.  But the will has a date which is
precise and definite.  If it is to be defeated by any paper sub-
sequently executed it is manifest that the fact of such subse-
quent execution must be affirmatively established.  It will not
do to show a state of facts from which it may be inferred that
the execution was subsequent.  This paper has no date.  It
may have been signed long before the execution of the will,
and in the present case all the probabilities are that it was so
signed.  But the question is one that cannot be settled either
by probabilities or possibilities.  An adequate testamentary
paper having a specific date had been actually established and
probated.  That paper is in itself completely efficacious, and
it is incapable of destruction by any other testamentary writing
unless the latter was executed at a subsequent date.  It is not
enough that such might have been the case, it must actually
have been the case.  If there is doubt about the fact of the
subsequent execution, the doubt decides the case against the
allegation of the subsequent execution.  The finding of the
register on this subject is of no consequence, because it is
founded upon an inference and not upon actual proof.  For
this reason therefore it should have been held by the court be-
low that there was no sufficient proof that the signature was
made after the execution, and because of the want of such proof
the writing on the box was not established as a subsequent
testamentary act, and it must therefore fail.  To our minds it
seems clear that the signature must have been placed there
long before the date of the will.  The affirmative testimony
produced by the appellee shows that the writing itself which
directed the delivery of the box was placed there several years
before the date of the will, and as it is the meaning of those
words that is in controversy it is entirely plain that they could
not have been intended to defeat a will duly executed long
after.  It is not the fact of the signature, but the meaning of
the words, that has controlling force in this point of view.  If
they were never intended to defeat a subsequently executed
will, they cannot have that effect if it were affirmatively shown
that the signature was appended after the execution of the will.
This consideration also is fatal to the proposition that the writ-
ten words are of a testamentary character sufficient to defeat,
or alter, or in any manner affect, the prior will.  If they were

not testamentary to this effect before they were signed, they could not possibly become so merely by force of the signature. In other words, the signature does not change the meaning of the written words on the box.  As they then imported only a direction to deliver the box, that is still their meaning.  If they then imported a testamentary purpose, that purpose was defeated by the subsequently executed will.

The argument that the signature was made after the will was executed because some of the papers contained in the box bore dates later than the will is entirely untenable.  It was fully proved that the testator had constant access to the box, and continued to take out and put in any papers he chose up to the time of his death.  There were quite a number of such papers. The certificate for thirty shares of Citizens' Traction stock was dated February 13, 1894.  The certificate for twenty shares of stock of the Ewalt Street Bridge Company was dated March 11, 1894.  The two certificates of fifty shares each of Standard Underground Cable Company were dated July 3, 1894.  These were found in envelope No. 13, on which the only words written were "Standard Underground Cable."  In the same envelope was found a receipted bill of Geo. B. Hill & Company, dated April 6, 1896.  In the envelope No. 1 was found a receipt signed by Geo. B. Hill & Company, dated February 13, 1894, certifying to the ownership by Geo. T. Jacoby of a large number of valuable shares of stock which stood in the name of Geo. B. Hill & Company.  There was also another receipt for other stock, certifying that 833 shares of Westinghouse Air Brake Company, Limited, of London, England, standing in the name of Geo. B. Hill & Company, and 7150 shares of La Noria Mining Company, in the same name, were the property of Geo. T. Jacoby, and this receipt is dated February 13, 1894, just ten days after the formal written codicil was executed.  On this envelope the only written words were "Dr. Geo. T. Jacoby."  In the envelope No. 1 there were also certificates for 933 shares of East Mayflower Gold Mining Company, all issued in the name of G. T. Jacoby, one of them dated January 12, 1894, only ten days before the date of the will, one dated February 3, 1894, the very day on which the codicil was executed, by which codicil the legacy to Mary Downs's children was cut down from one half to one fourth of the income of the residue of the estate.  And the other certificate was dated February 9, 1894, only six days after the date of the codicil.

In view of these facts it is absolutely certain that the dates
found upon the papers contained in the box had no relation
whatever to the time of affixing the signature. They prove
nothing but the fact that the testator was in the habit of put-
ting in papers at any and all times up to the time of his death.
They do not justify any kind of inference that the signature
was made after, rather than before, the date of the will and
codicil. For all the effect they can possibly have, the signature
might just as well have been appended years before the date
of the will. What conceivable premise can be stated which
would require, or even justify, a conclusion that the signature
was written after the date of the will? None whatever. And
how is it possible to conceive that, on the very day when the
testator executed a codicil depriving Mary Downs's children of
one half of the large legacy which they took under his will, he
was doing an act which would indicate a purpose to increase
their interest in his estate several times over? And on Febru-
ary 9, only six days later, the same act was repeated, and if
anything were needed to increase the force of the inference
that he had no such intent it is the fact that it is now contended,
and was so ruled in the court below, that the signature was
appended at some time between the 3d and the 13th of Feb-
ruary. In our judgment these very acts of February 3d, 9th
and 13th are proofs of the most persuasive character that he
could not possibly have had an intent at those times, so near to
the date of his will, to set aside and defeat, not only the particular
items, but the whole scheme of his most clearly expressed testa-
mentary purpose. It is not of the slightest use, but a waste of
time only, to argue from parol testimony as to declarations and
other acts done that the testator desired or intended to make a
disposition of his property other than that contained in his will.
The question at issue is, did he make a lawful will expressing
such an intention? In other words, did he make such a writ-
ing signed by him at the end thereof? To illustrate the folly
of such methods of making a will, it is only necessary to recur
to the testimony of A. K. Stevenson. He was asked: "Q. Did
he tell you that you had any personal interest or right to any-
thing in the box? A. Yes, sir, he said, after I got the box, to
open it and help myself. Q. Did he say there was provision
made for you? A. He said when I got the box just to put my

hand in take whatever I wanted to.  Q. Did he say there was
ample there; that you might help yourself?  A. He said there
was plenty there; he said not to be stingy with myself."  Will
it be admitted on behalf of the appellee that Mr. Stevenson had
thus acquired a testamentary right to take to himself such of
the contents of the box as he might please?  Certainly not.

The technical question still remains, is there a written will,
signed at the end thereof, to be found in the testimony in this
case other than the one regularly executed?  The only pretense
of such a will is the box and its contents, with the direction to
deliver the box to Stevenson, signed by the testator.  For the
reasons already set forth, we are most clearly of opinion that
there is no such writing as the law requires.

But there is another and most convincing line of reasoning
that leads to the same result.  The ruling of the court below
was that the two boxes and all their contents were of a testa-
mentary character.  The inclusion of the contents was a neces-
sary consequence of the ruling that the written direction to
deliver the box to Stevenson was the lawful execution of a tes-
tament.  If it was lawful as to some of the contents it was
lawful as to all.  And hence the decree specifically included
all the contents.  The circumstance most relied on was the
indorsements made upon the envelopes.  An examination of
these indorsements will develop some curious results.  Thus,
the envelope No. 1 contained the certificates for about 15,000
shares of stock, a mortgage for $10,000, a certificate that 378
shares of Citizens' Traction stock, seventy shares of Citizens'
Pass. Ry. stock, twenty shares of Ewalt St. Bridge stock, 770
shares of Westinghouse Air Brake stock, standing in the name
of George B. Hill & Company, were the property of George T.
Jacoby, and a similar certificate as to 833 shares of Westing-
house Air Brake Company, Limited, of London, and 7,150
shares of La Noria Mining Company stock.

Under the ruling of the court below, to whom does all this
property belong under this alleged will?  The only name, and
indeed the only writing on the envelope which contains all these
papers, is "Dr. G. T. Jacoby."  The reasoning of the court is
that the contents of the envelope belong to the persons whose
names are written upon the envelopes.  If this is correct the
entire contents of envelope No. 1 belong, under this peculiar

will, to Dr. G. T. Jacoby.   But that person is himself the testator, and it is his own alleged testamentary act that we are considering.   Moreover the envelope contains the written evidences of nearly the whole of his estate.   Of course, those contents cannot go to him, and as there is no direction on the envelope that they shall go to anybody, and as his name is the only one that appears on the envelope, there can be no testamentary effect attributed to the envelope or its contents, and the necessary inference follows, that as to this part of his estate he had no testamentary intent through the medium of the box and the envelopes.

The contents of envelope No. 2 were a large quantity of old tax receipts.   There was no name and no direction on the envelope, and the nature of the contents precludes the possibility of a testamentary intent as to them.   .

The contents of envelope No. 12 were a copy of the will of Mrs. E. Murray.   On the outside were written the words, " Mrs. E. Murray's Will-copy."   As a matter of course the testator could not possibly have had a testamentary intent as to this envelope.

The contents of envelope No. 13 were some fire insurance policies.   There was nothing in the testimony to show whether they were living or dead policies, but as the envelope had neither name nor direction on it there could not have been any testamentary intent as to it.

The envelope No. 14 had on it the words, " Aughenbaugh notes," and it was addressed to Dr. G. T. Jacoby, as if it had gone through the mail.   The contents were a package of notes, some stub check books and letters and copies of old papers seemingly of no value.   There was no name or direction on the envelope and hence it is not possible that the testator could have had any testamentary intent as to it.   The contents of envelope No. 15 were two certificates of fifty shares each of Standard Underground Cable Company of the par value of $100 each, a collateral note of Geo. B. Hill & Company for $5,000 on fifty shares of the same stock, as collateral, and a receipted bill of Geo. B. Hill & Company, dated April 6, 1896, which was about twenty-two days before the death of the testator. This envelope had an indorsement in writing upon it, to wit: " Standard Underground Cable," and upon the reasoning upon

which the decree is founded the contents would belong to that company. But, as this conclusion would be perfectly absurd, there is no such contention made, and we are shut up to the conclusion that, as to these evidences of property rights, there was no testamentary intent to be found in the box or its direction.

The envelope No. 16 had nothing on the outside except the written words "La Noria" and, in pencil, the figures and word, "7200 shares." The contents were certificates for 7,200 shares of La Noria Gold Mining stock. There is no evidence to show that there was any living person named La Noria, and as it would be absurd to suppose that the testator intended to give the shares to the company of that name, we must conclude that as to this envelope and its contents the testator had no testamentary intent through the medium of the box and its written direction. There was also found in this box a lot of old deeds, mortgages, agreements and a bank book of Lawrence Bank of Pittsburg, also some memorandum documents of old dates, and without value. They were adjudged testamentary by the decree, because they were in the box, but as it is simply absurd to regard them in any such light we can only reach the conclusion that the testator exercised no testamentary intent as to them, by inclosing them in the box and directing it to be delivered to Stevenson.

We are clearly of opinion that what has thus far been said demonstrates the error of the adjudication that the box and its contents, together with the direction to deliver it to Stevenson, constituted a testamentary act, or furnished any evidence of a testamentary intent, as to a very large part of the testator's estate. But the facts upon which that adjudication was founded are precisely the same as to the entire contents. That is to say, the indispensable writing and signature and the inclosure are all the same. If an inspection of the contents conclusively shows that, as to a large portion of them, there could not possibly have been a testamentary intent, either in using the box as a receptacle of the papers, or in writing and signing the direction to deliver it to Stevenson, there can be no logical or legal conclusion from those circumstances that there was any testamentary intent as to any of the contents. In order to make out a legitimate testamentary intent as to a portion of the con-

tents it would be necessary to find a testamentary purpose lawfully expressed and executed on that portion of the contents as to which it is claimed there was such an intent.  But there is no signature of the testator upon any of the envelopes or annexed to any direction contained on any of them, and hence this vital element is lacking as to all of them.

As to some of the envelopes, there is nothing on them but a name without any direction whatever as to the contents.  Thus, on envelope No. 4 the words " Rosalia Maternity Hospital Pittsburgh " alone are written.  Upon envelope No. 5 there is nothing written but the words " Home for the Friendless Allegheny City."  Envelope No. 8 had on it only the words " Frederick Seebick, Pittsburgh."  Upon envelope No. 10 there were only the words " A. K. Stevenson, Sr. or Jr. No. 439 Grant street, Pittsburgh."  Upon envelope No. 15 were the words " Standard Underground Cable," and on envelope No. 16 the only words were " La Noria " and " 7200 shares."  As to none of these envelopes or their contents is there the least expression of a testamentary intent on the box or on the envelopes or any where else, and it is simply impossible to believe that as to the last two there could have been in the mind of the testator any testamentary thought or purpose, yet all of them have been adjudged as such.  It is almost equally impossible to believe that the testator meant to give the contents of envelope No. 8 to " Frederick Seebick Pittsburgh " or of envelope No. 10 to " A. K. Stevenson," as neither of them was named as a legatee in the will, nor is there any extrinsic proof of such a purpose, except the ridiculous facts appearing in the testimony of Stevenson as to helping himself.  There are but five envelopes out of the whole sixteen as to which it can be contended that there was any actual expression of a possible testamentary purpose written upon the backs of them.  These are No. 3, on which were written the words, " This goes to Miss Mary Gress 228, 42nd St. Pittsburgh, Pa. ; "  No. 6, on which were written the words, " This is to go to Geo. B. Hill & Co. 1,400 shares.  To Frederick Sermin 150 shares ; to George H. Henderson 150 shares ; "  No. 7, on which were written the words, " This is to go to Mary Downs and her family, Greenville, Mercer County, Pa. ; "  No. 9, which had on it the words, " This goes to Mrs. Mary Downs Greenville Mercer County, Pa. or her family ; "  No. 11, on which were

written the words. " This to go to the G. T. Jacoby Protestant Orphan and Relief Fund, the net income arising therefrom," and in pencil the words " 833 W. A. B. C."

It cannot be known at this time whether it is or will be claimed that the words written on the envelope No. 6 were intended to operate as a bequest to Geo. B. Hill & Company, of 1,400 shares of Emmens Metal Company stock, to Frederick Sermin of 150 shares and to George H. Henderson of 150 shares each of the same stock. They were not named at all in the will; they were evidently business persons with whom he had business relations, and it is entirely probable that at the time the indorsement was written upon the envelope he had some reason for directing the delivery of the certificates to them. Geo. B. Hill & Company were his brokers, and he had many transactions with them in relation to his shares of stock. But it is not a matter of any serious consequence, because as to all of the indorsements on these envelopes it is a fact common to the whole of them that the testator did not sign any of them, and they are therefore fatally defective as testamentary writings.

There is however a very ready explanation as to all the envelopes and their contents. It was fully proved, and not contradicted, that Dr. Jacoby had a firmly fixed purpose to deprive his wife of any share of his property. He expressed this purpose in his will, and disclosed to Mr. Stevenson his desire to make a gift of his property during his life, but apparently not to take effect till after his death. Mr. Stevenson advised him that it was very dangerous to make a gift unless he made a complete delivery, and explained to him the law upon that subject, and went so far as to read to him some decisions in relation to the matter. After saying that he had read from 199 Pa. and 201 Pa. he was asked: " Q. Did you read some other Supreme Court opinions to him? A. Yes, sir; his intention was to make a gift." He then stated that he had had a conversation with Jacoby some time before about the box and its contents; that Jacoby had told him " how he had arranged matters inside the box, and that there were envelopes inside the box," and that he, Stevenson, should deliver them at his death. Whether this conversation occurred before or after the will was executed, the witness did not state, and did not remember. He said it was some weeks before Jacoby went on his journey, which was between March 4

and 8. If it occurred before the will was made, of course, it was not of the slightest consequence what was said, as the will took the place of all previous declarations, even if they were ever of any efficacy. If it occurred after the will was made, it was nothing but a futile attempt to dispose of his property by a parol gift, not to take effect until after his death, which was of course entirely illegal and of no effect. All the probabilities are that the conversation occurred before the will was made, and that he had simply neglected to remove the envelopes. This conclusion is sustained by the consideration that the will was carefully and deliberately prepared and executed. Stevenson testified that the consultations in regard to the preparation of the will commenced in December and continued through January, until the will was finally completed in exact accordance with Jacoby's wishes, and it was then duly executed and attested on January 22, following. In addition to this the provisions of the will are in such absolute hostility with the delivery of the contents of the envelopes to the persons named on them that it precludes the possibility of their being parts of the same testamentary purpose. They are incapable of being carried into effect together.

Thus the will, after giving a few special legacies, directs the sale of all his property, real and personal, and the conversion of his entire estate into money, and gives the whole of the proceeds to his executors to be securely invested "in first class mortgages." He then gives his library to the Young Men's Christian Association of Pittsburg, and the sum of $1,000 to his namesake, George T. J. Folk. He then directs his executors to pay over all the rest of the estate to the Safe Deposit and Trust Company of Pittsburg, in trust, to invest it in first class mortgages and pay out the income, one half to the children of Mary Downs, naming the children, and as each child reaches the age of twenty-one years his or her proportion of the principal is to be paid over absolutely to the legatee. The next clause of the will gives one eighth of the whole residuary estate to the trustee to be held for Ethel Jacoby, a niece, on the same terms as to interest and principal as in the case of the preceding bequest to the children of Mary Downs. The remainder of the estate is to be invested in mortgages, and to be known as "G. T. Jacoby Protestant Orphan Relief Fund," and the income

arising therefrom to be paid to "the various Protestant Orphan Asylums and institutions wherein orphans are cared for within the county of Allegheny," and also to "The Concordia Home of Butler county, share and share alike." These gifts are only of income, and are evidently intended to be perpetual. Under this will Mary Downs gets nothing of either principal or income, except that she is to draw the income of such of her children as are under the age of twenty-one years, provided she uses the money for their education.

By the codicil executed on February 3d, following, about twelve days later, the legacy of one half the income of the residuary estate to the children of Mary Downs is reduced to one fourth, the testator saying he believed that one fourth would be sufficient.

It will thus be seen that the real testamentary purpose of this decedent, carefully expressed in a written will, was to give the great bulk of his estate to charitable uses, and only one fourth to the children of Mary Downs, and one eighth to his niece Ethel Jacoby. If the tin box and the envelopes were to be treated as his will, or as a part of it, a large part of the estate given by the written will to the charities would be altogether diverted, and would go to Mary Downs directly. These two purposes cannot be executed together. The one almost entirely frustrates and destroys the other. Under the written will Mary Downs gets nothing of the principal, and only part of the income to be used for the education of the children. If she takes the envelopes and their contents, she takes a large part of the estate and thereby greatly impairs the charities. It is not possible to believe that Dr. Jacoby intended to do any such thing, and if he did he would have done it in plain writing, duly executed, as he did in the case of the codicil. But, whether he intended to do so or not, he has not expressed any such purpose in a way that accords with the requirements of the law. Our statute of wills of April 8, 1833, contains the following most salutary and wise provision as to the manner in which written wills once made must be altered, viz : "Sec. 14. No will in writing concerning any personal estate shall be repealed, nor shall any bequest or direction therein be altered, otherwise than as is hereinbefore provided in the case of real estate, except by a nuncupative will, made under the circumstances aforesaid,

and also committed to writing in the lifetime of the testator, and after the writing thereof read to or by him, and allowed by him and proved to be so done by two or more witnesses." And the preceding section 13 provides " No will in writing concerning any real estate shall be repealed, nor shall any devise or direction therein be altered, otherwise than by some other will or codicil in writing, or other writing declaring the same, executed and proved in the same manner as is hereinbefore provided, or by burning, canceling or obliterating or destroying the same by the testator himself, or by some one in his presence and by his express direction."

As there is not the slightest pretense that any of the requirements of these two sections of our wills' act were followed in this case, it results inevitably that the written will of the decedent dated January 22, 1894, and the codicil, also in writing and duly executed, dated February 3, 1894, are his only lawful will and codicil, and must be so declared and adjudged. The manifest consequences which would necessarily flow from disregarding the plain and positive provisions of our statute of wills are so dangerous, so appalling in their character, that they cannot possibly receive the sanction of the judicial mind. The very moment that we tolerate the establishment of testamentary acts by dubious acts, by loose declarations, by mere verbal utterances proved by the testimony of witnesses whose memories, whose habits of attention, whose defective hearing, whose interested motives, whose imperfect and heedless conception of the meaning of words, may utterly fail to correctly express the testamentary intent of the testator, we enter upon a boundless sea of uncertainties and a vast mass of litigations, endangering titles and impairing the security of property rights to a most alarming extent.

Such a policy is but the substitution of the verdicts of juries who are controlled by mere passing whims or caprices, by prejudices, by passions or by mere sympathies, for the deliberate and carefully guarded written expressions of testamentary intent which our positive statute law now requires, and which all the experience of all civilized peoples proves to be the only safeguard for the testamentary succession of estates. We have gone far enough in tolerating departures from strict statutory requirements, and it is to be hoped that we will take no further

step in that direction. A most remarkable instance of the uncertainty and the folly of permitting such loose methods to prevail occurs in this very case. There were two tin boxes belonging to the testator, which were found in the same custody after his death. One of them was the one heretofore described. The other had on it a paper with the following words written on it, " This box belongs to Mrs. Mary Downs—mustn't be opened only by her. Children, this is my will. Dr. G. T. Jacoby." On the inside of this box was another paper containing the written words, " Mary I want you to divide the contents of this box between your children that is just living when it falls in your hands. I hope you will carry it out to the letter. Dr. G. T. Jacoby." The first of these writings does contain a testamentary declaration. It says, " Children, this is my will," and it is signed by the testator. But when the contents are examined it is at once apparent that it is not his will, because the box contains nothing but a few old daguerreotypes, some silverware and a very little jewelry. It contained none of his securities nor any valuable assets of his estate. Yet he solemnly declared in writing that it was his will. If that were really so, his estate would have to be distributed under the intestate law, notwithstanding his tin box testament. As between the two tin boxes, this one would have to be declared to be his will, because he positively says so, and he says nothing of the kind, and nothing of a testamentary character, on the other. As between the tin boxes and the written will there can be no comparison as to their legal efficacy.

Turning now to the authorities cited, it will be found upon examination that they are entirely insufficient to support the contention of the appellee. The decision chiefly relied upon to sustain the ruling of the learned court below is Fosselman v. Elder, 98 Pa. 159. In that case the testator had executed a formal will in which she gave several legacies to her niece, Isabella Fosselman, who lived with her. She afterwards died suddenly in January, 1880. Among her papers was found a sealed envelope indorsed in her handwriting thus, " Dear Bella this is for you to open." There were contained within the envelope a promissory note for $2,000, made by the trustees of a church, to the order of the testatrix, payable one year after date, and also a paper of which the following is a copy:

. "LEWISTON, Oct. 2, 1879.

"My wish is for you to draw this $2,000 for your own use should I die sudden.

"ELIZABETH FOSSELMAN."

The whole of this paper, including the signature, was in the handwriting of the testatrix. It was held both by the court below and by this Court that the paper was undoubtedly testamentary in its character, intended to take effect after the death of the testatrix; that it was signed by her at the end thereof and that it clearly designated the accompanying note as the subject of the bequest. The only question was whether the testatrix had sufficiently indicated the person who was the object of her bounty in the paper which was claimed to operate as a codicil to her will. The court below held that she had not, but this Court held that she had, and sustained the papers, consisting of the note, the written and signed paper, found within the envelope, and the envelope, with the words written upon the outside as a valid codicil.

It will be observed that there was no question as to the fact of there being an actual testamentary paper, dated, written and signed by the executrix. The writing on the envelope was simply resorted to in order to ascertain who was the legatee. As it indicated without any doubt who the legatee was, and was written by the testatrix on the very envelope which contained the note and the testamentary writing, we held it could properly be resorted to for that purpose. But the importance of this connection was clearly expressed in the opinion by the present chief justice, who said, "It is true the testamentary paper does not designate the plaintiff by name, and if we had no written evidence to show who was meant by the pronoun "you" the bequest of the note would be void for uncertainty, but it is a settled fact that the note is addressed to the plaintiff, and why not that indorsement in the handwriting of the testatrix be taken as part of the testamentary disposition." It thus appears that all the controlling facts upon which the Fosselman case was decided are entirely absent from this one. In that case there was an absolute testamentary paper actually written and signed by the testatrix. In this case there is nothing of the kind. There the writing on the envelope distinctly desig-

nated the person who was to open the envelope and who was to be the recipient of the legacy. Here the writing on the box was a mere direction to deliver the box to a third person, and did not contain the slightest reference to the appellee. In the present case there is no signature of any kind appearing on the envelopes, while there it was a conclusive fact that the genuine signature of the testatrix was affixed to the very testamentary writing which gave the legacy. And in that case there was no conflict between the gift of the legacy and the provisions of the will, because the will excluded notes and bonds from the devise and bequest in favor of the niece; and the codicil gave her one of the notes which she could not have taken under the will. So far from this case supporting the contention of the appellee, it makes against her when the facts and the reason for the decision are considered. In Knox's Estate, 131 Pa. 220, cited for the appellee, the writing was clearly testamentary, and the only question was whether the signature of the testatrix, being only her christian name, was a sufficient signature under our statute. We held that it was, but it does not help the case of the present appellee, because here there is no signature whatever to any testamentary paper. The same is true of Wilson v. Van Leer, 103 Pa. 600, also cited for appellee. The paper was clearly testamentary, and was properly signed. Frew v. Clarke, 80 Pa. 170, is of the same character and therein differs entirely from the present case. Rose v. Quick, 30 Pa. 225, Turner v. Scott, 51 Pa. 126, and Tozer v. Jackson, 164 Pa. 373, were all cases of the same kind. In all of them the signature of the testator was directly affixed to the paper in question, and the only controversy was whether the papers could be considered as testamentary. Porter v. Turner, 3 S. & R. 108, Ginder v. Farnum, 10 Pa. 98, and Wikoff's Appeal, 15 Pa. 281, are also in the same category. Not one of these cases affords the least assistance to the contention of the appellee. They are not relevant, because they are founded upon testamentary facts which have no existence in the present case.

On the other hand there are a number of decisions which are in clear antagonism with the claim of the plaintiff, and much more analogous in their facts. Thus, in Plumstead's Appeal, 4 S. & R. 544, the decedent left among her papers certain envelopes containing securities, such as bonds and certificates of

bank stock, and indorsements upon the envelopes as follows : Upon one of them, containing a number of bonds and a certificate of bank stock, the words, " For Rebecca Hutton," who was her own daughter, were written by the decedent. And on the other were the words, " For the heirs of George Plumstead," also written by her. These papers were deposited by the decedent in a mahogany box, and were kept by her until her death. It was held by this Court that as the words on the envelopes were not signed by the decedent they could not be proved as a will. We see no reason why this case is not analogous to the one we are now considering. The indorsements are of the same general character as are found on the five envelopes which contain directions or names as to who are the persons indicated as the recipients of the contents. But in both cases they are not signed, and in the reported case that circumstance was held to vitiate them as wills. In Patterson v. English, 71 Pa. 454, there were certain writings made by the decedent in a memorandum book, and there was a signature of the decedent attached at the end of the entries. These writings were of this character ; one of them in the words :

"January 12, 1871.

" Ann Freeburn, daughter of Clinton Freeburn, $1,000 to be paid unto Clinton Freeburn her father for education of his daughter."

Another of the writings was in the following words, " Fanny Smith, formerly Fanny Meck $500 to be paid into the hands of her brother Clinton Freeburn for the use of daughter and in case she Fanny Smith formerly Fanny Meck may come to need to see that she is made comfortable, the interest being all yearly, the daughter may want."

There were four more writings of a similar character but in favor of other persons, and at the end was affixed the decedent's name. There was some little conflict of testimony as to whether the signature of the decedent was genuine, though it was admitted that the body of the writing was his. There was also a quantity of parol testimony, as is usual in such cases, to prove that the decedent had verbally declared his intent to make the gifts indicated by the writings ; that he had made a will ; that he had his things all fixed, and other expressions of a similar

character.   The question was whether these writings could be probated as a will.   The court below held that the jury might find them to be a will.   We held this was error and reversed the judgment without a venire, holding that the words were not of sufficient testamentary character.   In the course of the opinion it was said: " But how does it appear that the incomplete memoranda in this case were intended to operate as a will? There is nothing on the face of the paper or in the words themselves to indicate such intent, nor is there anything from which it can be inferred that any gift was intended, except the words, ' to be paid,' in the first, second, and fourth items.   But when were the amounts specified in these items to be paid?   In the lifetime of the writer or after his decease?   There is nothing in the language to show when they were to be paid.   These items may have been intended as instructions for his will, or as memoranda of gifts he intended to make in his lifetime.   The mere words, ' to be paid ' do not amount to a testamentary bequest of the sums mentioned, nor show that they were to be paid after his death."   There is much more to the same effect in the opinion, and it is all quite applicable to the facts of the present case.

There is a still stronger ruling in the case of Zimmerman v. Streeper, 75 Pa. 147.   Streeper held a bond against Zimmerman; he indorsed on it, " I request my executors to give this bond to Anna for her great kindness she has shown to me and her grandmother."   This was signed and sealed.   After it was written, " This is not to interfere with what I will to her this she is to have beside that."   Anna was the granddaughter of the obligee and the wife of the obligor.   The bond was not delivered to Anna, but remained in the obligee's possession with his other securities till his death.   We held that the bond did not pass to Anna.   We said: " We can discover in this case nothing more than an intent on the part of George Streeper to authorize his executors to deliver the bond in question to the wife of the debtor in the bond, after his death.   There was no delivery; and no intention to deliver by George Streeper himself in his lifetime. . . . The writing is not a trust nor an assignment, but simply an intended or prospective gift, to be carried into effect by his executors."   This ruling covers every aspect of the writings on the envelopes which specially indicate

Mary Downs and her family, Frederick Seebick, A. K. Stevenson, Mary Gress, Rosalia Maternity Hospital, "Home for the Friendless," Geo. B. Hill & Company and the Protestant Relief Fund. As to none of them is it said that the executors are to deliver them to the persons named, and thus it lacks the strong element appearing in the Zimmerman case. In none of them is it said when they were to be delivered. In none of them is there a solitary word of a testamentary character. There is nothing to indicate anything more than an intended or prospective gift, never followed by any delivery. The words in the Zimmerman case are infinitely stronger than any that are to be found in this.

Without prolonging the discussion, it is only necessary to say in conclusion that we are most clearly of opinion that only the original will of the decedent dated January 22, 1894, and the codicil dated February 3, 1894, can be admitted to probate as the last will and testament of the testator. We hold that neither the tin boxes, nor either of them, nor any of the contents of either of them, can be treated as testamentary writings of any kind whatever.

The decree of the court below is reversed at the cost of the appellee and the record is remitted for further proceedings.