## FLINTHAM *v.* BRADFORD.

The cancellation of a second will which had revoked a former will by implication leaves the former will in full force—if it be retained by the testator until his death uncancelled. And this effect of such cancellation cannot be rebutted by evidence of conveyances of part of the property mentioned in the former will— nor by evidence of a reconciliation having been effected between testator and certain members of his family disinherited by the former will—nor by evidence that one of the trustees there named had died before the cancellation—nor by proof of testator's subsequent declarations, inconsistent with an intent to revive the former will.

Nor is it material that testator made a third will inconsistent with the former wills, but which did not contain apt words to pass real estate; nor are declarations, by a devisee under both wills, that testator intended to pass real estate

by such will, evidence to rebut the presumption of an intent to revive the former will.

Testator died in 1838, leaving a will dated in 1821, with an unsigned addition; a will dated in 1824, which had been cancelled at an uncertain time, and which was inconsistent with the will of 1821; and a will dated in 1835, which did not purport to pass real estate.—*Held*, that the will of 1821, so far as it passed real estate, then held by testator, was revived by the cancellation of the will of 1824.

CERTIFICATE from the Nisi Prius.

*Feb.* 13, 14. This was an ejectment by one of the heirs of Thomas Bradford the elder; and the question was, whether a will of said Thomas, dated in 1821, and which had been revoked by a will made in 1824, had been subsequently revived by the cancellation of the will of 1824, and whether the parol evidence offered was admissible or competent to rebut the presumption of an intent to revive it.

The testator died in 1838, having had six children, some of whom died before him—among these was a daughter, Mary Flintham, one of whose children was the present plaintiff.

The defendant, claiming under the wills, gave in evidence a will dated in 1821, which had been admitted to probate. The material parts of this will were as follows: " As to my worldly goods, I devise all my ground-rents, stock, bonds, the lot of ground on Seventh and Lombard streets, and the lot of ground on Spruce street, near *Schuylkiln*, which shall be let on ground-rent as soon as possible, shall be formed into a fund under the direction of Thomas Bradford (the present defendant), Eliz. Darrach, and Susan Ritter," whom he directed to receive the rents and profits, and pay certain sums thereout to the children of his son Samuel—to his daughter Elizabeth Darrach, for life, remainder to her children— to the children of his son William, and to his daughter Susan Ritter, for life, remainder to her children. He further gave a legacy to the children of his deceased daughter Mary Flintham, and to the children of his son Thomas a yearly sum. To Ann Field an annuity, and certain land for life, remainder to a daughter of his son William, remainder to a daughter of his son Samuel. After disposing of certain chattels, the will continued: " As to my lands, I will and devise that the whole shall go into the hands of my son Thomas, in trust for my grandchildren, to whom, as they come of age, he shall give by lot one or two tracts, making between four and five hundred acres, without dividing the tracts as surveyed. He first having taken out my tract in Penn's Neck and all the

lands belonging to me in Beaver county," which he gave to Thomas for life, remainder to his children.

By an unsigned codicil or addition to the will, he further directed that, out of the interest of certain debts due by William Flintham, the legacies to his children should be paid, and he further gave an unintelligible direction, respecting a debt due by his son William.

The defendant further gave in evidence another will of Thomas Bradford, dated in 1835. The material parts were: "As to my worldly goods of all sorts and kinds, I will and direct they shall be put under the care and kept as a general fund (excepting certain chattels) by my executors and their successors, for the term of one hundred years from and after my decease—and all the rents and profits to be equally divided between my four children, Samuel, Thomas, William, and Susan, and on the death of either of them, the portion of the deceased to be paid to each of their children equally." At the end of one hundred years, the whole was directed to be equally divided among "the survivors who shall retain the name of Bradford, and be lineally descended from me."

By a codicil reciting that his son Samuel had involved his brother Thomas in trouble by non-payment of notes, &c., he directed his executors should pay Thomas three-fifths of the legacy given to Samuel, until the debt was paid. And further reciting, that his son William had involved him in a debt to the family of James Darrach, he directed that three-fourths of his legacy should be paid towards the debt.

The plaintiff then offered in evidence a will dated in 1800, which was rejected by the court. He also gave in evidence a will dated in 1824. The signature to this will had been cancelled, and opposite the signature was written "cancelled." This will made a disposition of testator's entire estate, both real and personal, differing from that made by the will of 1821. He further offered to prove that since 1831, the testator had conveyed on ground-rent the whole of the lot on Seventh and Lombard streets, and part of the lot on Spruce street, mentioned in the will of 1821, for the purpose of showing that such changes had been made in that property; but the court rejected the evidence.

He then offered to prove the death of Elizabeth Darrach in 1824, who was one of the trustees named in the will of 1821, for the purpose of showing a change in the circumstances of the family after the date of that will, to be followed by other proof of such alteration, and of a change in the disposition and feelings of the testator towards members of his family omitted in the will of 1821,

subsequent to the date of the will; that certain members of his family, from whom his affections were alienated when he made the will of 1821, and by which will he had deprived them of any share in his estate, had been entirely restored to his affection and good-will when he made the will of 1835; the declarations of testator after he made the will of 1835 inconsistent with an intention to revive the will of 1821; that neither when testator made the will of 1835, nor since, had he sufficient personal estate to create the fund mentioned in that will; that between 1821 and 1835, testator had parted with various items of real and personal estate included in the will of 1821, and had entirely changed the condition of his estate from what it was when that will was made; admissions by the defendant of the change in the feelings of the decedent above referred to, and that the decedent intended to pass all his estate, real and personal, by the will of 1835.

GIBSON, C. J., in rejecting the evidence, said: " Much as I dislike the practice of raising questions by exceptions to evidence, on the decision of which depend the principles of law which must rule the cause, yet I know there are cases in which evidence cannot safely be received, leaving the effect of it, under the direction of the court, to the jury, and this is one of them. The competence of the evidence before me must be determined in the first instance, and I have no difficulty in sustaining the objection. It was accurately said by Chief Justice McKean, in Lawson *v*. Morrison, 2 Dall. 286, that the destruction of a will which repealed or superseded a previous one, leaves the first as if the second had not existed, unless it be clearly proved that the second was destroyed with a view to die intestate. Such is the result whether the second contain a clause of revocation or not; for neither of them takes effect till the testator's death; the revocation of the second restores the first to the footing on which it stood before the second existed; and the first necessarily, as well as naturally, takes effect at the death, unless the testator had signified by some decisive act or declaration, at the time of the revocation, an intention to die intestate ; or unless there was a change in the state of his family, an alteration in the nature of his estate, or other circumstances, which, independently of the second will, would be a revocation of the first. But the intention must exist at the time of the destruction, for if it does not, the first will is restored to its former standing as of course, and being so, it cannot subsequently be revoked by anything that would not have revoked it had the second not been made. But what is the proper evidence of the testator's intention at that

H

time? Undoubtedly contemporary declarations of it, or the inter-
mediate occurrence of circumstances which would be independent
grounds of revocation, without aid borrowed from the existence of
a subsequent will. To allow declarations of intention entertained
at a subsequent time, or subsequent circumstances, to be evidence
of the testator's intention at the time of the cancellation, would be
no less than to give them the effect of a parol revocation, which is
forbidden by the statute. On this ground I have been led to doubt
one of the principles of Boudinot *v.* Bradford, 2 Dall. 266, S. C.,
2 Yeat. 170, to say nothing of Lawson *v.* Morrison, notwith-
standing the well-merited reputation of Chief Justice McKean,
and no less the merited reputation of Chief Justice Tilghman, who
gave those cases his approbation. In the first of them, Dr. Rush
was allowed to prove the testator's death-bed intention to die intes-
tate, as evidence of his intention when he destroyed a will which
had, for a time, been superseded by a preceding one. What was
that but to make his declaration indirectly an equivalent for a parol
revocation? The testator had not declared his intention when he
cancelled the second will, but he declared it only at the time when
he was speaking; and on no principle of law or reason could his
intention then be taken for a true sample of a preceding one. In
Moritz *v.* Brough, 16 S. & R. 403, declarations of a testator,
posterior to his execution of his will, that he had intended to make
a different disposition of his property, but that he had been driven
from it by fear of violence on the part of his wife, were held to be
incompetent, and though my brother ROGERS and myself dissented,
it was not because we thought such declarations would be compe-
tent to repel a presumption like the present, but because we thought
them evidence of duress on the ground of necessity. The case of
Oldfield *v.* Nelson, 2 Vern. 76, in which similar declarations were
received, to persuade a Chancellor that it was not his duty to lend
himself to the execution of a testamentary trust, was of that stamp.
As I have already said, the acts and declarations at the time of
the cancellation, or such an intervening change in the state of his
family, such as marriage and the birth of a child, or such an alter-
ation in the nature of his estate, or such other circumstance as
would be an independent ground of revocation, can alone rebut
the presumption of an intention to revive a precedent will, which
the law raises from the cancellation or destruction of a subsequent
one. Now, the death of a child will not revoke a precedent will,
nor will it rebut the implication of an intent equivocally expressed
to restore it, after it has been displaced, to its former standing.

It requires direct and express evidence to do that, for we should have no rule on the subject, and no certainty of result, did we allow juries to weigh probabilities. The evidence of the death of the testator's daughter, and of the time of it, therefore, is excluded."

He then directed a verdict for defendant, saying there was no evidence to affect the validity of the will of 1821.

*E. K. Price* and *Meredith* (*St. George T. Campbell* was with them), for plaintiff in error.—A will contains the intention of the testator as to the conveyance of his property after his death, and that intention must be expressed in legal form. Such was the effect of the will of 1821. But when the will of 1824 was executed, being equally effective as a conveyance, it annihilated the previous one. How then can it be said that the prior will, which he had thus solemnly declared had ceased to contain his intention, has any future effect as evidence of that intent? While it is conceded that the second will operates as a revocation of the first, it is said the cancellation of the second revives the first, because it was not annulled or destroyed. To annul is "to reduce to nothing:" and does not a revocation reduce to nothing? It is to render "of no worth; to invalidate." In fact it is a destruction of everything but the mere paper and ink. When the will of 1824 was cancelled, there was a declared intent it should not operate to convey the property; and if at that time his intent was, that the will of 1821 should not continue to be his will, the cancellation did not revive it. Now the intention of cancellation, whether with a view to die intestate, or to revive a prior will, can only be gathered from circumstances, as was conceded *arguendo* in 2 Dall. 288. Until this intent be established, the will of 1821 remains revoked; and we offered to show that no such intent existed. It was conceded we were not estopped from proving it. We did not offer parol evidence of an intention to revoke, but merely to rebut the legal presumption of an intent to revive, arising from a revocation of that which he had revoked. This may always be done by parol. It was so conceded in 2 Dall. 288. The cases of rebutting resulting trusts by implication are to the same effect. 2 Dall. 267, 2 Yeat. 170, reiterates the very point, and the evidence was received. But when was the cancellation made? It is said the date written opposite to it shows the time; but that is the date of the will, and it cannot be presumed to have been done then. The true presumption is, it was done when the will of 1835 was made. But it is held that no subsequent words can increase or vary the effect of a

will: 4 Raw. 323: how, then, can this equivocal word have effect to make the will relate back to its former date, 1821? It is then said, that if it does operate as a new will from the time of its revival, the part before the signature is valid, and the unsigned part void: but that was denied in 6 Barr, 409. In effect, the decision is to allow parol evidence only on one side. The revival of the will is proved by parol evidence of the cancellation of a subsequent will. If that is inadmissible, there is no revival; if admissible, contradictory evidence of the same sort is also admissible.

*Mallery* and *J. Sergeant* (*V. Bradford* was with them), contrà. —The point now raised, strikes at the root of a settled rule of conveyancing—one, too, so clear, that Lord Mansfield, not disposed to adhere to rules not founded in reason, refused to hear argument against it. The effort is, to apply the rules of the ecclesiastical courts, respecting testaments, to overturn the uniform rule of the common-law courts governing wills. By the civil law, the making of a second will annulled a prior will, without regard to the inconsistency of the two instruments; and this because the mere appointment of an executor made him testamentary heir, both of realty and personalty: 2 Dom. Pt. 2, B. 3, Tit. 1, § 3; 1 Ib. Pt. 2, B. 1, Tit. 1, § 1; 1 Cowp. 90. There could not be two testaments: 1 Wms. Ex. 88; Swinb. 523. To revive the former will on cancellation of the second, required the same formalities as the making a new will. This doctrine has been modified in the ecclesiastical courts. But the common law doctrine was wholly different: all the instruments are, by that law, ambulatory until the death of the testator. Then they operate as voluntary conveyances or appointments from the dates of their execution, subject only to revocation, *pro tanto*, or in the whole by subsequent inconsistent wills: Cowp. 90; 1 Saund. 276, f. n. 4; 1 P. Wms. 575; 11 Mod. 122; 2 Ves. 427. So far is this carried, that it must appear affirmatively, that the subseqent will was inconsistent, or contained an express clause of revocation: 1 Saund. 278–9, n. 4; 1 Jarm. 156–8; 1 Pow. on Dev. 517–18; Cro. Eiz. 721; 1 Show. 537; Ib. P. C. 146; 7 Bro. P. C. 443; 3 Wils. 497; 2 Bla. 127; 2 East, 488.

These cases show that two wills may stand, so far as they are not inconsistent, and that the mere making of a second operates as an implied revocation, only in the event and so far as the second is operative on the death of the testator. The principle of the case is exactly as in 4 Burr. 2512, except that that is even stronger; for the

second will contained an express clause of revocation: 3 Hill, Mass. 433; Bull. N. P. 266. This, then, is the doctrine of the common law; that, apart from any question of intention, the first will is revived by a cancellation of the revoking will. That intent may, however, be rebutted in the ecclesiastical courts: Pow. on Dev. 528, n. 7. But now the rule seems to be, that the admission of declarations to rebut the presumption, is the only distinction: 2 Addams, 116. The rules of these- courts do not prevail here, except so far as adopted by the acts of Assembly. The common-law rule and cases have been recognised: 2 Dall. 266, 289, 290; 1 S. & R. 256; 8 W. & S. 295; and in other states: 2 N. & McC. 482; 3 H. & M. 502; 1 Pick. 535. It is said the evidence was admissible, because the act of cancelling was equivocal. That is true; but it is only equivocal as to the intent—if done with a view to destroy, it is not equivocal as to the consequences which flow from it—whether it was done by accident or mistake, or through ignorance, the cases agree may be proved, and then the act is without effect. But such were not the offers nor the tendency of the evidence. None of them were admissible as part of the *res gestæ,* nor were any declarations of any intent in the act of cancellation, other than the act implied. Subsequent declarations of an intent not to revive the former will, could not be received—they are excluded by the acts of 1705 and 1833: 2 Yeat. 170; 16 S. & R. 403; 2 W. & S. 450, 455; 2 H. Bl. 516; 4 Barr, 376; 2 Ib. 110. The implication from circumstances is not recognised in the common law: 11 S. & R. 145. The sales made, only operated as a revocation, *pro tanto:* 4 Barr, 88; 4 Greenl. 341. 8 S. & R. 573, turned on the fraud. As to any intent from the will of 1835, that is out of the question—this court having decided that it was not intended to pass realty. As to the presumption that the cancellation was made at the date of the will of 1835— the law does not afford it, nor would it be material. It did not operate as a republication of that day—but left the first will to operate from the day of its date: 4 Raw. 323. Nor is the will of 1835 a codicil, but a distinct testament: 1 Will. on Ex. 7. The question is then narrowed down to a mere rule of conveyancing of real estate, and it has been settled and acted upon to an extent that no alteration can be made by the court.

*April* 13. COULTER, J.—The first question is, whether the will of 1821 was restored and revived by the cancellation of the posterior will of 1824.

And the second is, whether the evidence offered by the plaintiff below and rejected by the court, ought to have been admitted. These comprise the whole case.

It is material to observe, that no doubt whatever exists as to the wilful and premeditated intention of destroying or cancelling the will of 1824. That is apparent on the paper itself. There is no allegation, nor the least room for a suggestion, that it was done by accident, mistake, or fraud. There is, therefore, no occasion to let in any testimony, or invoke the aid of any principle of law on that subject. The plaintiff's case is in fact founded on the cancellation of the will of 1824. He claims as heir-at-law. Taking it, therefore, as beyond cavil, that the act of cancellation on the part of the testator was wilful, what effect had that act on the prior will of 1821, which he preserved intact and sound ?

All wills are in their nature inchoate and ambulatory until testator's death, at which time, and not before, the testament becomes operative and complete. The will of 1824 was an inchoate intention, mutable and inconstant, and, by the wilful and deliberate act of cancellation on the part of the testator, it became as if it never had been. The prior will of 1821, being preserved by testator entire, and without intentional or apparent blemish, became *the* will for the time being, which would be consummated at testator's death, unless before that time he manifested a change of intention, according to the rules of law.

That change of intention would be manifested by making a new will, or a revocation of the prior will might be presumed even from subsequent acts of the testator; but only from those acts which of themselves have been adjudged to afford sufficient evidence of an entire change of intention, and, therefore, constituted of themselves independent revocations.

These acts are such as burning, destroying, cancelling, or obliterating the instrument. Or by marriage of testator and birth of a child, conveying away the whole of the estate, &c. But none of these acts were present here, as regarded the will of 1821. So that if it was restored by the act of cancellation of the posterior will of 1824, it must remain the will of deceased.

The language of Lord Mansfield in Goodright *v.* Glazier, 4 Burr. 2514, in which Justices Yates and Willes concurred, is strong and clear to the point. "A will (he says) is ambulatory till the death of the testator. If testator lets it stand till he dies, it is his will. If he does not suffer it to do so, it is not his will." Here he had two. He has cancelled the second. It has no effect,

no operation. It is as no will at all, being cancelled before his death. But the former, which was never cancelled, stands as his will." And Chief Justice McKean, in Lawson *v.* Morrisson, 2 Dall. 286, following in the same track, says, that the destruction of a will, which repealed or superseded a previous one, leaves the first as if the second had not existed. This, of course, relates to a will of real estate, as the ecclesiastical courts had jurisdiction of a will of personal estate. In these courts, a doctrine, somewhat at variance with the rule so clearly established by the Court of King's Bench, prevailed. And it is from the ecclesiastical cases, that the argument of the learned counsel of the plaintiff in error, seems to be drawn. But even there, it is gradually giving way, and the rule established in the common-law courts is almost, if not entirely, adopted. Thus, Sir J. Nicholls expressed an opinion in Usticke *v.* Bawden, 2 Addams, 116, that where two wills are found in testator's possession, the posterior will formally cancelled and the other not, the presumption is strongly in favour of the uncancelled will. And, in a note to Pow. on Dev. 530, Mr. Jarman says, that he was favoured by Dr. Addams with information, that the case of Usticke *v.* Bawden had been since brought to a final hearing, when the court decided in favour of the prior uncancelled will. I refer, also, to the case of Burtenshaw *v.* Gilbert, 1 Cowp. 53, and more especially to Harwood *v.* Goodright, Ib. 92, as strongly confirmatory of the rule so clearly expressed in Goodright *v.* Glazier.

It would appear, then, to be sufficiently established that the act of cancellation, deliberately and intentionally performed, of a posterior will, does of itself revive and restore a prior will, preserved by the testator.

And this brings us to the consideration of the rejected evidence.

The will of 1800 could have no possible relevancy to the question at issue. The plaintiff claims to establish that the testator died intestate; that the will of 1821 was not restored by the cancellation of the will of 1824. How could an act done in 1800 anticipate time, and establish, repeal, supersede, or modify that which was made twenty years afterwards? The death of a child or a trustee named in a will, can neither repeal, revoke, nor invalidate it. The death of Elizabeth Darrach, therefore, could have no possible effect on the will of 1821, so far as its existence and validity as a will were concerned.

The other rejected evidence is all of the same class and character, and would, in effect, if allowed to prevail, defeat the rule in regard

to the effect which the cancellation of a posterior will has on a prior one preserved by testator; and would also amount to a revocation by word of mouth. I will admit that if it was clearly proved that the testator, at the time he cancelled the posterior will, intended to die intestate, but had not the prior will then in his possession or power, so as to annul or destroy it, that such intent existing at the time of cancellation, and connected with it, might be given in evidence as part of the transaction or *res gestæ;* just in the same manner and for the same reason that a cancellation by accident or misadventure, such as throwing a wrong paper in the fire, obliterating the name by mistake, or accidentally throwing ink instead of sand on the paper, could be proved as explanatory of the act. But the intent and the acts evidencing it ought to be contemporaneous with the act of destruction. Because the very preservation of the prior will beyond that period, when in his possession and power, at the time he annulled the posterior one, was evidence of an intent to die testate, and keep a will in readiness to be consummated by his death. It was in fact and in law set up and restored, as if the posterior will had never existed. And it cannot be repealed or revoked by word of mouth, or subsequent circumstances and declarations, unless those circumstances amount to a revocation in law, such as marriage and birth of a child, alienation of the estate, &c.: Moritz *v.* Brough, 16 S. & R. 403.

The case of Boudinot *v.* Bradford, 2 Y., does not conflict with the position here taken. That was a case, *sui generis*, with strong peculiarity of facts; in which it was necessary, in the application of general principles, to mould in some degree their harmony of outline, but the strong lineaments are there.

In support of the exclusion of the evidence, I might cite Comfort *v.* Mather, 2 W. & S. 450; Goodtitle *v.* Otway, 2 H. Bl. 516; Lewis *v.* Lewis, 2 W. & S. 455.

I may add, that this doctrine is in entire conformity with the 13th section of our present statute of wills, which announced no new principles, but merely gave to those already sanctioned by the courts a statutory habitation.

The distinctive feature of our jurisprudence, relative to the acquisition and transmission of title to real estate, is, that it should be made stable, uniform, and certain, either by writing, or by some notorious act, upon which the mind can fix and rest with certainty, and not hang upon the flickerings of memory in relation to incessant declarations, not being part of or connected with the noto-

rious act, on which title depends. Frauds and perjuries are thereby avoided.

On the whole, we see no error in this record. The same light was struck up at Nisi Prius, which guided Lord Mansfield and his associates in banc under like circumstances.

Judgment affirmed.