Ford's Estate.

*John Hemphill*, for Leighton M. Ford, appellant, exceptant.

*Benjamin B. Hoar* and *Frank B. Rhodes (Lutz, Ervin, Reeser & Fronefield* with them), for Media Title & Trust Co., trustee under will of Albert E. Ford, dated Oct. 26, 1927, with codicil dated Jan. 26, 1928, appellant, exceptant.

*Green & Quinn*, for Thomas J. Williams, co-executor under will of Albert E. Ford, dated Oct. 23, 1926, appellant, exceptant.

*H. Gordon McCouch* (of *Dickson, Beitler & McCouch*), for trustees of the University of Pennsylvania, one of the legatees under the will of Feb. 15, 1924, admitted to probate *(Joseph P. Gaffney* and *Frederick W. Breitinger*, attorneys for executors under said will, with him), appellee, contra.

HENDERSON, J., Jan. 10, 1930.—Three appeals from the Register are before us: (1) From the decree admitting to probate the writing of Feb. 15, 1924, and codicil of Nov. 12, 1924; (2) from the decree of the Register refusing probate of the writing of Oct. 23, 1926; and (3) from the decree of the Register refusing probate of the writing of Oct. 26, 1927, and codicil of Jan. 26, 1928.

The testator died March 22, 1928, having revoked the writings described as above in the paragraph numbered (3) by mutilating them. It was contended, though not proven, that this revocation was done without the necessary mental capacity. We concur in the opinions of the Register and of the Presiding Judge and for the reasons given by them, and, hence, this appeal is dismissed.

The second writing (2) was executed in duplicate, the original having been in the immediate custody of the decedent. It was not found after the decedent's death, and, hence, we must conclude was destroyed by him. The duplicate, duly executed, was produced by the draftsman, who testified he had given the original to the testator; one of the witnesses thought the carbon copy was the original. The destruction of the original draft of this will by the testator was a revocation thereof and no effect may be given to the copy thereof, even though one witness believes the copy to be the original. This appeal is likewise dismissed.

This brings us to a consideration of the first will which was admitted to probate.

The appellant is the only child of the decedent, and in support of his appeal contends:

1. That the will and codicil of 1924 were revoked on Oct. 23, 1926, and on Oct. 26, 1927, by wills or other writings declaring a revocation, as required by section 20 of the Wills Act of 1917; and

2. That the intention of the decedent to die intestate has been established and must be given effect.

In support of the first proposition, it is contended that the revocation clauses contained in the wills of 1926 and 1927 were not ambulatory, but were instantly effective on the execution of those wills, and, hence, even though they were destroyed by the testator, their virtue remains and the will and codicil of 1924 are revoked. It is contended that this result follows because section 20 (a) of our Wills Act, in addition to revocations by a will or codicil, permits a revocation by an "other writing declaring the same," and proved in the same manner. By a deed, for instance. We have not been given any reason why such a result should follow and can find none, although such a rule apparently pertains in some states. We will seek for the origin of this clause and endeavor to find a reason, if any there be, why a revoking clause in a later will or codicil should be instantly effective although the instrument has been destroyed by the testator, merely because the statute permits revocation by an "other writing declaring the same." It should be noted that these are wills and not "other writings," and, hence, ambulatory, unless some reason for so construing the statute can be shown.

The second proposition contended for is really an appeal to the court to disregard the rules of the common law and resort to the principles of ecclesiastical law. Indeed, the argument of the first proposition is also an appeal to ecclesiastical principles.

The able opinion of the Register contains an excellent review of the Pennsylvania cases and we shall not supplement it. The origin of the clause "other writing declaring the same" in the Wills Act, section 20 (a), is not difficult to

trace. The Report of the Commission contains this note: "This is section 13 of the Act of April 8, 1833, . . . which was founded on section 6 of the Act of 1705 . . . that section, however, relating to personal estate only."

The Commissioners who drafted the Act of 1833, as to section 13 thereof, made the following note: "This follows the note of the Commissioners of 1830, which states that section 13 of the Act of 1833 'is nearly a literal transcript from the Act of 1705, excepting that in the latter the provision is confined to wills of personal estate, probably, as we have already suggested, from inadvertence. In this section it is confined to real estate.'"

Section 13 of the Act of 1833 is not, however, taken from section 6 of the Act of 1705, but from section 6 of the English Statute of Frauds, 1677, as to which the Commissioners of 1832 said: "The 5th and 6th sections of the Statute (of Frauds), however, which direct the forms of execution and revocation of wills of lands, were omitted by our Legislature:" Parke & Johnson Digest, 876.

We direct attention to this fact because this clause (section 20 *(a)*, Act of 1917) first appeared in our statutes in the Act of 1833, and was not in the Act of 1705. Section 6 of our Act of 1705 is almost a literal transcription of section 22 of the English Statute of Frauds, relating to personal property, and now embodied in section 20 *(b)* of our Act of 1917. This clause of the Statute of Frauds, 29 Car. II, ch. 3, 1677, was prepared by a skilled draftsman, probably Lord Nottingham. See Hening on "The Original Drafts of the Statute of Frauds and Their Authors," 61 Univ. of Penna. Law Rev. 283.

From skillful drafting we are justified in assuming that the words are used in a correct technical sense. The "other writing" means exactly what it connotes—a writing not a will or codicil, proven, however, in the same manner. There is no hint in any of these acts that, because of the presence of the clause in question, a clause of revocation contained in a will or codicil is not ambulatory, but is instantly effective; nor can such result be reached by any reasonable intendment. Wills and codicils are ambulatory, and, hence, when the statute provides for revocation by such instruments, an ambulatory method has been adopted, and we can find no reason for any other construction.

Why was this clause "other writing declaring the same" inserted in the Statute of Frauds? In the early days there was considerable doubt as to the right to revoke a will. See Holdsworth in his "History of the English Law" (vol. 3, pages 423 and 444); Swinburne (1635 ed.), 175. The provision for revocation was put in the statute to safeguard that right, and the "other writing" clause was added to make assurances doubly sure.

The clause has occasionally served its purpose. In 1 Jarman on Wills (5th Am. ed.), *165, we find an illustration of such use: "An instrument purporting to be a conveyance, but incapable of taking effect as such, may, nevertheless, operate to revoke a previous devise, on principle, as it should seem, that the attempted act of conveyance is inconsistent with testamentary disposition, and, therefore, though ineffectual to vest the property in the alienee, it produces a revocation of the devise. . . ." See, also, Swinburne (1635 ed.), 192.

Even a deed, void in equity, but valid at law, did revoke a previous devise: Jarman, *167, citing Simpson *v.* Walker, 5 Sim. 1; Hick *v.* Mors, Amb. 215, and Hawes *v.* Wyatt, 2 Cox, 263. In the note in 4 Purdon's Digest, 5133, as to this "other writing" clause, it is said: "This other writing need not be intended to take effect as a will or codicil, and, therefore, need not be pro-

pounded to the register for probate: Rudy *v.* Ulrich, 69 Pa. 177. . . . And must be signed by the testator: . . . Lewis *v.* Lewis, 2 W. & S. 455. As to what is not a sufficient writing to revoke a will, see Jacoby's Estate, 190 Pa. 382."

In Gensimore's Estate, 246 Pa. 216, it appeared that the purchaser of a piece of real estate had, after making a verbal contract, made a payment on account of the purchase money and entered into possession and made certain alterations to the dwelling. The decedent had executed a deed for the property, placed the same in escrow—delivery to be made when the balance of the purchase money was paid—and it was held that the execution of this deed, although no longer effective, operated to evidence a change of intention to leave the property to the devisee named in the will, and it acted as a revocation thereof under the "other writing" clause.

We may conclude from the common law background and the use of this clause that there is nothing therein to lead us to infer that the insertion of this clause in the statute was intended to render clauses of revocation in wills and codicils other than ambulatory.

It may not be amiss for us to inquire into the origin of the Statute of Frauds from which our Wills Act is derived.

In 1 Page on Wills, 597, it is said: "The bench and the bar had called the attention of the public to the danger of permitting oral testaments, without any restriction as to the place of making or the number of witnesses, but warnings based on the possible application of abstract principles of law produced little practical effect. A striking and celebrated case called the attention of the public to the danger of so lax a rule. In that case testator, when advanced in years, had married a young woman whose conduct during her married life was imprudent if not depraved. He died, leaving a written will, by which a considerable part of his property was bequeathed to charitable purposes. The widow, by subornation of perjury, induced nine witnesses to swear that testator had made a nuncupative testament *in extremis*, by which he revoked his written testament and bequeathed his property to his widow. The conspiracy failed, and the fictitious testament was defeated. At the hearing of this case, Lord Nottingham made the famous remark, that it was his hope 'to see one day a law that no written will should be revoked but by writing.' The next year the Statute of Frauds, 29 Car. II, ch. 3, was passed. The question as to who was the author of this famous statute is involved in much dispute; but it seems extremely probable that Lord Nottingham's support greatly facilitated its passage, and that certain sections of that statute were framed to meet the case of Cole *v.* Mordaunt," stated in note to Mathews *v.* Warner, 4 Ves. Jr. 186, 196.

And at page 635, the same author says: "This recognition of informal revocation by oral declarations had its natural result in bold attempts to defeat wills by fabricating evidence of the declarations of testator. The history of one of the most glaring of these conspiracies is given in a note to Mathews *v.* Warner. This particular attempt to defeat justice met with disastrous failure; but the wish already quoted that there should some day be 'a law that no written will shall be revoked but by a writing' was entertained by the whole English bar, and soon found expression in the Statute of Frauds."

The confusion which exists in the cases in American jurisdictions has been caused by a failure clearly to recognize the differing principles applied in jurisdictions reasoning from common law principles as distinct from those in which ecclesiastical principles have been adopted. Traces of this confusion

will be found in a few Pennsylvania cases, in none of which, however, have the ecclesiastical principles been imbedded in the body of our decisions.

In Gardner on Wills, page 241, it is said: "The question as to the effect of the revocation of a second will upon a prior will with which it was inconsistent has been much mooted, and the difference of opinion is marked and not wholly explicable. At common law, the rule seems to have been that, upon the destruction of the second will, the first 'revived,' regardless of the intention of the testator, providing he had kept his first will undestroyed and uncanceled."

In note 8 is cited Harwood v. Goodright, 1 Cowp. 91, in which Lord Mansfield said that "if a testator makes one will, and does not destroy it, though he makes another at any time, virtually or expressly revoking the former, if he afterwards destroy the revocation, the first will is still in force and good."

"But the rule in the ecclesiastical courts was that it was to be regarded as a question of intention, to be collected from all the circumstances of the case, and that the legal presumption was neither adverse to, nor in favor of, the revival of a former uncanceled will upon the cancellation of a later revocatory will. The matter was open to a decision either way, solely according to facts and circumstances. The question was settled in England by statute, under which it has been steadily held that after the execution of a subsequent will containing a revoking clause, or provisions inconsistent with those of a prior will, such former will cannot be revived by the simple cancellation or destruction of the later will.

"In the United States, in the absence of legislation, the influence of the differing points of view of the common law and the ecclesiastical courts is abundantly manifest. When the second will contains no revoking clause, there is strong authority for the view, which seems correct on principle, that its destruction 'revives' a prior uncanceled will. These cases go upon the ground that, while the inconsistent provisions of the second will clearly manifest an intent on the part of the testator to revoke the prior will, yet this intent, being purely testamentary in its character, can have no effect until the death of the testator, and if the instrument containing it is destroyed before that time, this revocatory intent is, for legal purposes, as though it had never been, and the first will, being uncanceled, takes effect.

"Where the second will contains a revoking clause, there is a line of cases holding that the destruction of such a will is followed by the same result as attends the destruction of a second inconsistent will, without such clause, and for the same reason. This view, it will be observed, is that of Lord Mansfield, and, assuming the revoking clause to be purely testamentary in its character, is convincing:" Gardiner on Wills, page 241.

In Williams on Executors (page 127), it is said:

"It was long a vexata quæstio whether the principle of law was, that, on the revocation of a later will, a former uncanceled will should revive or not. In the Common Law Courts, it was certainly laid down as an absolute proposition, excluding all questions of intention, that the former will should revive.

"In the Ecclesiastical Courts, it seems that a different doctrine from that laid down in the Common Law Courts prevailed; for it had been decided in a variety of cases that the presumption was against the revival of the prior will, and that the onus was thrown on the party setting it up to rebut that presumption."

It may be safely said without further citation of authority that at the common law the rule as laid down by Lord Mansfield prevails unless changed by statute. Such a change has been made in England by the Statute of Vic-

toria, adopted in 1837, and counsel suggests that by "analogy" we should follow it. Our courts have no such authority; that request should be addressed to the Legislature. Pennsylvania is a state where the English common law prevails, and where, at the very outset, Penn had repudiated all ecclesiastical jurisdiction in the settlement and distribution of estates of decedents: Scott's Intestate System in Pennsylvania, pages 2 and 3.

In considering the early cases of Boudinot *v.* Bradford, 2 Dallas, 266 (1796), and Lawson *v.* Morrison, 2 Dallas, 286 (1792), and Flintham *v.* Bradford, 10 Pa. 82 (will executed in 1821, revoked by another in 1824, which later was destroyed), it must be remembered that the clause "other writing declaring the same," the effect of which we are considering, was not incorporated in the Act of 1705, but was first introduced into the body of our law in 1833.

Kerchner's Estate, 41 Pa. Superior Ct. 112 (1909), and Manning's Estate, 46 Pa. Superior Ct. 607 (1911), are cited by the appellant in support of his contention. They are, however, both rested on Forquer's Estate, 216 Pa. 331, which the Supreme Court said, in Holmes's Estate, 240 Pa. 537-544 (1913), was mere *dictum* so far as republication by parol was concerned.

The only case like that under consideration which we have been able to find in Pennsylvania is McCartan's Estate, 58 Pitts. L. J. 364 (1910), in which the opinion is by one of our ablest jurists, Judge Hawkins, of Allegheny County. The facts given in the report are as follows:

"This is an appeal from the decision of the Register refusing to admit to probate as the last will of Mary McCartan, deceased, a testamentary paper dated January 11th, 1905. Its execution was proven by two witnesses; but the respondents allege that it was revoked by a subsequent will made by the decedent on the 17th of December, 1906. The execution of this will was also duly proven; but Mrs. McCartan on the 7th day of December, 1907, in the presence of three witnesses, directed it to be destroyed for the purpose of revocation. It was then torn into fragments, which have since been reunited, the paper offered in evidence, and it contains a clause revoking all former wills made by the testatrix.

"Hawkins, P. J., April 29, 1910.—The principle is well established in Pennsylvania that the destruction of a will which repealed or superseded a previous one, leaves the first as if the second had not existed. Such is the result whether the second contains a clause of revocation or not; for neither of them takes effect until the testator's death; the revocation of the second restores the first to the footing on which it stood before the second existed; and the first necessarily as well as naturally takes effect at the death unless the testator had signified by some decisive act a different intent. The question here then turns on what constitutes legal evidence of this intent? The Act of 1833 expressly excluded evidence of parol declaration. Repeal must be in specified forms of writing, cancellation or obliteration and these forms are obviously as applicable to one as to two or more wills found among testator's papers. The purpose of the law was to prevent fraud and perjuries; destruction was just as much within this purpose as was the making of wills; and when two or more wills are made and retained by testator they are equally within its protection. If one must be destroyed in the prescribed method so obviously must the other. When a second will is destroyed it seems to be thought that revival of the first is a mere implication which testator may orally defeat; but in form it is separate and distinct from the second and its implied promotion *ipso facto* on destruction of the second is the law's recognition of its separate entity. It clearly comes within the declaration of the Act of 1833 that 'no' testamentary writing shall be repealed except in the methods prescribed, for such is its char-

acter, and just as clearly within the mischief of the Act, for it may just as readily be made the subject of the same motive and method of attack.

"The cases cited against this view arose out of facts existing prior to the passage of the Act of 1833. Two of them were decided at a time when the greatest liberality was shown by the courts in the admission of parol evidence (Murry v. Murry, 6 W. 356); and in the third, evidence of cancellation was refused because it was not part of the res gestæ; and nothing was said about the bearing of the Act of 1833 on the question."

The first will, which we are now considering, was carefully prepared by and for the testator. For safekeeping he left it with the trust officer of a trust company in which he was the largest stockholder and which was to become one of his executors. He made other wills and codicils while physically preserving this one intact, and, hence, when he destroyed the two later wills, the conclusion is irresistible that he intended that it should become effective as his last wish.

The animadversions of counsel for the appellant upon the University and its learned Provost are entirely uncalled for and should have been omitted.

While the testimony offered by the appellant was properly excluded, it is but right that we should direct attention to the fact that if such testimony were admissible, no will in Pennsylvania would be safe from attack. Parol revocations were forbidden in England in 1677 and in this State in 1833.

The action of the Presiding Judge is affirmed, all exceptions are dismissed and the record is remitted to the Register.

STEARNE, J., dissenting.—I am unable to concur in the conclusion reached by the majority of the court. All of the writings offered for probate, as wills, should have been refused. The Register properly declined to probate the mutilated will of 1927, as well as the executed carbon copy of the will of 1926, the original of which, under the proofs submitted, having been presumptively destroyed by the decedent. The probate of the will of 1924 was in error, because I am of opinion that the evidence offered of the res gestæ and of all the facts and circumstances surrounding the mutilation and cancellation of the latest will (1927) established the fact that the decedent did not intend to revive the will of 1924 (the one probated), but, upon the contrary, intended to die intestate.

Briefly summarized, the undisputed facts are: The decedent, a widower, with an only son, had been highly successful in business and had amassed a large fortune. Obviously, he was a most vigorous and dominating character, his likes and dislikes being especially intense. His son was associated with him in his business, and until the time of the son's marriage, relations between the father and son were harmonious. Decedent violently disliked his daughter-in-law, and this attitude persisted until his death. He did everything within his power to separate the son and his wife, and did, in fact, succeed in so doing for a brief period of several months. When the son chose to return to his wife in 1921, and against the wishes of the decedent, this caused an absolute estrangement between the father and son, which continued until February, 1924. Through the intercession of a friend, the son and father became slightly reconciled. Friendly relations thereafter grew progressively more cordial, and at the time of decedent's death, on March 22, 1928, their relations were most friendly. Decedent was over eighty years of age when he died, and Leighton, his son, was about fifty-three.

After the break in the family relations between the father and his son, the decedent determined that his son should not participate in any manner in his

estate. Decedent became a lonely, disappointed and embittered old man. His express desires and wishes had been defied and denied by his only son. He still persisted in his disaffection for the son's wife. The expression of his feelings and animosity was crystallized in the preparation of his various wills. From the evidence it appears that during the above period a number of wills were prepared and executed, of which the legal record of but the three wills now in question survives.

Decedent's principal testamentary object became his interest in apple growing. He determined to found a school of pomology. This principal object was not deviated from in the wills of 1924, 1926 and 1927. Changes were made in the details and methods of carrying his purpose into effect, as well as the persons or institutions who should be charged with the execution thereof, but his main testamentary object remained unaltered.

It is worthy of note that in the latest will, that of 1927, the decedent for the first time remembers his son. He provided a $5000 annuity for him. In neither of the other two wills is the son remembered.

It is also of importance to remember that the decedent told the scrivener, at the time he executed the 1927 will, that he had no other wills. It was this will of 1927 which the decedent kept by him in his home and placed in his locked bureau drawer.

In February, 1928, the decedent had entered upon his last illness. He was confined to his home, attended by physicians and nurses. It is apparent he was contemplating and reviewing his life and the purposes and objects of life generally. He discussed with his physician, Dr. Wilson (page 99), the affection he had for his son, and then, for the first time, disclosed the question which had arisen in his mind as to the wisdom of substantially disinheriting his only son and using his vast residuary estate in establishing a school to teach apple growing. His words are significant: "I have just been thinking. What is it to die and have an apple named after you? . . . Yes, when I only have one son, he is my blood. Why should I die and have an apple named after me?"

This was the ancient call of blood; it was a natural and normal parental instinct breaking through the wall of hatred, spite and reprisal which decedent had been so long in building to shut out and punish his only son. The germination of this thought apparently convinced the decedent of the fallacy and manifest injustice of his contemplated testamentary act, because, at 3 o'clock in the morning of March 17, 1928, he awoke and was talking about "will" and "Leighton;" at 4.30 A. M., he requested his nurse to call his private secretary, who lived at the same apartment with him. The secretary came into the room and decedent directed him to get his will, which he did. This was the will of 1927. Decedent then told the secretary to turn to the last page. Decedent then took the will in his own hands and tore and crumpled his signature. He then handed it to his secretary and said: "Tear it and tell Leighton he is all I've got." The secretary did as directed. This testimony is corroborated by the nurse.

Because of the foregoing facts and circumstances, I have formed the opinion that the appellant very clearly and legally established that such mutilation and cancellation of the will of 1927 was accomplished by the decedent with the intent to die intestate.

Still desperately ill, bedfast and in great suffering, the decedent lived five days after the cancellation of his will and died on March 22, 1928.

The three wills now in question were respectively offered for probate. The will of 1927 contained an express clause revoking all former wills. As this will was revoked by mutilation, as stipulated in the Act of 1917, I agree with the majority of the court that it should not have been probated.

The will of 1926 (also containing an express clause of revocation) was proved to have been executed in duplicate, the original having been taken by the testator. I agree with the majority of my colleagues that the legally presumed destruction of the original copy by the testator was a revocation of both copies, and, therefore, the executed carbon copy cannot be probated as a will. This writing was, therefore, properly rejected.

The next will offered for probate was the will of 1924. This is the will which, in accordance with his custom, the assistant title officer had carefully preserved along with countless other wills of which his trust company was custodian. He was interested in its preservation because the trust company was the executor named therein for the settlement of this large estate. It does not appear that he ever gave the decedent a written receipt therefor. It is also to be remembered that this is the document that had been twice theretofore revoked in writing, by the decedent, in the two wills above mentioned. Also, that in 1927 when the latest will was prepared and executed decedent told the scrivener that he had no other wills. From the facts and surrounding circumstances unquestionably decedent believed this to be true.

The opinion of the majority of the court rests upon the theory that the will of 1924 was revived as a matter of law upon the cancellation of the will of 1927. Because the will was discovered in its pristine condition, unrevoked by any *probatable* will or writing, and not mutilated or otherwise burned, canceled, obliterated or destroyed, as provided by section 20 *(a)* of the Wills Act of 1917, they find as a matter of law that the will of 1924 stands as the decedent's last will and testament, and must be probated as such.

It is with this conclusion that I disagree.

It seems inharmonious with reason, and against authority, to admit parol testimony to establish the *fact* of mutilation, cancellation or revocation of the later wills, and at the same time to shut out all evidence of the surrounding facts and circumstances connected with such mutilation, &c. The one act of tearing and obliterating created all the resultant effects. Surely, all the facts and circumstances ought to be freely admissible to ascertain the testamentary intent. That *quo animo* concerning the cancellation of a will, containing a written revocation of prior wills, may be established by parol is an established principle under our Pennsylvania law. The cases in this Commonwealth are few, but the principle seems to have been consistently maintained and applied. The latest case is Manning's Estate, 46 Pa. Superior Ct. 607. The Pennsylvania rule is, when a will containing an express revocation of all former wills is revoked (as provided by the statute), leaving an earlier will in existence, the earlier will is revived, unless there is an intent not to revive it. Expressed in other words, *there is a presumption of revival, but such presumption may be met by proof that testator intended to die intestate.*

In Manning's Estate, *supra*, the testatrix left an earlier will with her husband for safekeeping. She subsequently destroyed, by burning, a later will, and stated that she intended to have a new will prepared. It was held that the evidence was sufficient to establish that in so revoking her will she intended to die intestate, and not, *ipso facto*, to revive, by operation of law, her former will. See, also, Kerchner's Estate, 41 Pa. Superior Ct. 112; Wulff's Estate, 26 Dist. R. 144; Stephenson's Estate, 6 Pa. C. C. Reps. 628, and Flintham *v.* Bradford, 10 Pa. 82.

While it is true that there is one lower court decision by an eminent Orphans' Court judge, to wit, McCartan's Estate, 58 Pitts. L. J. 364, apparently to the contrary, it is interesting to note that the legal effect of the opinion is somewhat impaired by his finding of conspiracy and perjury in the testimony. While he promulgates a contrary rule, in effect, he considered and applied the testimony.

The majority opinion brushes aside Manning's Estate, *supra*, and Kerchner's Estate, *supra*, because both, it is claimed, relied on Forquer's Estate, 216 Pa. 331, which the Supreme Court said in Holmes's Estate, 240 Pa. 537, 544, was *dictum* as to republication by parol.

I do not feel that the authority of these cases can be so lightly discarded. The underlying principles rest upon a much firmer and broader foundation than *dictum* as to parol revocation of wills. I concede that revocation may not be by parol; Seiter's Estate, 265 Pa. 202. Manifestly such procedure would violate the very purpose of the Statute of Frauds, written into the Wills Act of 1917.

This will of 1924 has been twice revoked in writing by the decedent himself; first, by the will of 1926; and, secondly, by the will of 1927. Both of these writings are still in existence, and part of this record. To automatically revive, by operation of law, and without opportunity to establish *quo animo* concerning the destruction or mutilation of the revoking will, certainly gives a much wider effect to the statute than is warranted by its terms, or what the framers have intended.

Before dealing with the results of the most able and exhaustive antiquarian researches of the Register of Wills, and of the majority of the court, concerning the question herein involved, attention is directed to two cases where parol testimony is unquestionably admissible, and which may affect a writing offered for probate, viz., parol evidence relating to *animus testandi* and *animus revocandi*.

A paper, perfect in the form as a will and with a genuine signature of a decedent annexed, may, I take it, be shown by parol to have been executed in jest, or for some other reason, and was not in truth and in fact, nor was it ever intended to be, the last will and testament of the decedent. If such testimony were sufficiently firm and abundant, I do not think there is any question but what the lack of *animus testandi* may be proved: Gardner on Wills (2nd ed.), page 15; Page on Wills (2nd ed.), § 43.

And, conversely, a will torn or mutilated may be shown to have been the result of fraud, accident and mistake, and lack of such *animus revocandi* may likewise be established. Certainly, such proof violates no principle in the Statute of Frauds, as contained in our Wills Act, and neither does the proof offered in the present case: Brock's Estate, 247 Pa. 365.

It is true that the question concerning the revival of the prior will by the revocation of a later will has always proved a difficult problem. As pointed out in an extremely well written note to Whitehill *v.* Halbing, 28 Am. Law Reps. 911, there are five possible theories which may be adopted, viz.:

1. The earlier will is revived as a matter of law.
2. The earlier will is revived unless an intention to the contrary appears.
3. The earlier will is not revived.
4. The earlier will is not revived unless an intention to revive it appears.
5. The question is one of intention without any presumption for or against revival.

Owen J. Roberts, Esq., of this Bar, has written an excellent article upon the subject, published in 48 Am. L. Reg. 505.

All five theories have variously been accepted in different states of the United States and in England. The subject is undoubtedly confused by the differences in historical origin between English common law, effected by the Statute of Frauds, and the decisions of the Ecclesiastical Courts.

The first theory: That the earlier will is revived as a matter of law is the accepted common law view. The basic reason for the rule is that a will is ambulatory until death, and, therefore, a will which is *itself* revoked can have no effect as a revoking instrument. This was the rule anciently applied in England. It had its inception (as pointed out by Mr. Roberts) in an opinion by Lord Mansfield in Goodright *v.* Glazier, 4 Burr. 2512 (1770). It is interesting to note that, irrespective of the ultimate result of Lord Mansfield's decision, the court at that early date felt that the ascertainment of intention was important as bearing on the question of the revival of the former will.

However, after the principle became engrafted upon the common law, England discarded it. By Act of Parliament, 1 Victoria, ch. 26, § 22 (1837), it was provided that the earlier will once revoked could only be revived by a republication. The old common law rule was wisely changed because of its manifest miscarriage in the ascertainment of the real testamentary intent. Mr. Roberts approves of such a rule and says in his article (page 521): *"The statute of 1 Victoria was suggested by long experience in England and has been found quite satisfactory in its operation."*

Our Pennsylvania courts, always alert to preserve and enforce, wherever possible, a testamentary intent, have rejected the common law rule and have accepted the second theory mentioned in the foregoing annotation, to wit, *the earlier will is revived unless an intention to the contrary appears.*

It may be that the legal philosophy of the rule is not founded upon exact and scientific legal reasoning, yet the rule is practical and sound. It follows the common law to the point where it raises a *presumption* that the earlier will is revived, but allows the presumption to be met by evidence to establish the intent of the decedent. Perhaps our rule has reflected in it traces of the ecclesiastical decisions, but, as Mr. Roberts observes, the ecclesiastical rule *"has the merit of getting at the justice of the case,"* which, in the end, is the primary function of any judicial tribunal.

In the instant case, the decedent, in writings under his hand, twice revoked the present writing probated as his will. True it is that neither of such writings may be probated *as wills*, but they remain as an indelible record of decedent's intention that the will of 1924 was not intended as his last will and testament. These written evidences of intention may well be "other writings declaring the same" under the Act of 1917. It seems anomalous to me to admit evidence of actual mutilation and at the same time to decline to receive *all the evidence and surrounding circumstances* which so clearly reveal the reasons and intent of the cancellation. To revive an earlier will by operation of law and to disregard the manifest and provable intent of the decedent is too harsh and hard a rule to be applied in this Commonwealth. The evidence is clear and unisputed that the motive and reason in his mutilation was that the decedent desired to die intestate and to pass his estate to his only son.

To reject this evidence and deny proof of *quo animo* concerning the cancellation of his will, to my mind, not only violates the existing law of Pennsylvania, but disregards the plainly expressed testamentary intent of the decedent, and will be productive of the gravest injustice to his only son and heir-at-law. I, therefore, record my dissent.

NOTE.—For valuable opinions of the Register in this case, see Appendix.